Harold E. KOHN, Trustee, et al.,
Plaintiffs,

v.

AMERICAN METAL CLIMAX, INC.
and

Roan Selection Trust, Ltd., et al.,
Defendants.

Civ. A. No. 70-933.

United States District Court,
E. D. Pennsylvania.

Nov. 25, 1970.

As Amended by Orders of Jan. 15
and Jan. 16, 1971.

ON MEMORANDUM AND ORDER
AMENDING JUDGMENT

Harold E. Kohn, P. A., Stuart Savett, Barney Welsh, Philadelphia, Pa., for plaintiffs.

Morris R. Brooke, Drinker, Biddle & Reath, Philadelphia, Pa., Marvin Schwartz, John L. Warden, Carroll E. Neesemann, Sullivan & Cromwell, New York City, for defendants.

MASTERSON, District Judge.

## PROCEDURAL HISTORY

On April 8, 1970 plaintiff, a trustee of American Depositary Receipts representing 2000 shares of Roan Selection Trust, Ltd., (RST), a Zambian corporation, filed a complaint against defendants, American Metal Climax Company (AMAX) and Roan Selection Trust, Ltd., seeking to enjoin the proposed amalgamation of the defendant companies on the grounds that the disclosure provisions of the Securities Exchange Act had been violated, that the amalgamation

was violative of the antitrust laws, was unfair to non-AMAX shareholders of RST, and was effectuated by the fraud and breach of fiduciary duty on the part of certain directors of RST. From May 11th to 18th a hearing was held on plaintiff's motion for a preliminary injunction. On June 8th we filed an Opinion, 313 F.Supp. 1251, making Findings of Fact and Conclusions of Law, denying without prejudice plaintiff's request for a preliminary injunction on the grounds that it was premature in that (1) before the amalgamation could be effectuated it would have to be approved by the shareholders who, prior to the vote, were to be sent an explanatory statement which was intended to fully explain the proposed amalgamation, and (2) if and when the shareholders voted in favor of the plan, it would then have to be submitted to the High Court of Zambia for its approval. In late June, just prior to the time when the explanatory materials were to be sent, plaintiff made a motion to enjoin their distribution on the ground that they were violative of the Securities Exchange Act. On July 2nd we held a hearing on plaintiff's motion and, at that hearing, enjoined the distribution of the explanatory materials. The defendants' appeal from this action was dismissed on the ground that, since no written order had been executed by the District Court, the Court of Appeals had no jurisdiction. On July 8th we entered a written order enjoining the distribution of the materials unless certain conditions were met by defendants. These conditions were met and we allowed the materials to be sent without prejudice to the plaintiff's claims that the materials were violative of the Securities Exchange Act. On August 5th, just prior to the time when the proposed amalgamation was to be put before the shareholders for a vote, plaintiff again made a motion to enjoin the defendants from taking any further steps to effectuate the amalgamation. We denied plaintiff's motion on that same day only insofar as it sought to enjoin the amalgamation from being put before the shareholders for a vote.

On the balance of plaintiff's motion we held a hearing on August 12th. On August 6th the shareholders voted to approve the reduction of capital, the first step necessary to effectuate the amalgamation. On August 12th we preliminarily enjoined the amalgamation, making Findings of Fact and Conclusions of Law that the plaintiff had demonstrated a strong probability that he would, upon final hearing, be granted relief. We set the case down for a final hearing for September 8th. On August 13th the defendants appealed our August 12th Order. On that day, the Court of Appeals stayed the effect of our Order upon certain conditions, one of them being that the defendant AMAX would deposit with the Court ten million dollars as security for any injury plaintiff might suffer from the granting of the stay. On August 14th the High Court of Zambia approved the reduction of capital. Also on August 14, 1970, plaintiff made a motion to the Court of Appeals for a re-hearing of the August 13th appeal and for an amendment to the Court of Appeals Order of August 13th. On August 31st the Court of Appeals amended and supplemented its August 13th Order in certain respects and further ordered that this court proceed forthwith with the trial and disposition of the case, notwithstanding the pendency of an appeal from our preliminary injunction, and that we reach final judgment prior to October 29, 1970. On August 25, 1970 plaintiff made a motion for leave to file an amended and supplemental complaint and for summary judgment. During this time we continued generally the final hearing scheduled for September 8th. On September 14th we granted plaintiff's motion for leave to file an amended and supplemental complaint and on that day the complaint was filed adding, *inter alia,* new party defendants. On September 21st the defendants moved for summary judgment. On September 25th we heard oral argument on the cross motions for summary judgment and on September 30th both motions were denied. On October 5th the trial of this case commenced and a jury was called. On that

day, after the calling of the jury, the parties entered into a stipulation waiving their rights to a jury trial. At that time the case against the new defendants added on September 14th was severed and it was agreed that the case should proceed solely against the defendant companies, the trial being continued to October 13th. On October 8, 1970, plaintiff moved in the Court of Appeals for a further amendment of the Court of Appeals Order of August 31st. The Court of Appeals amended its August 31st Order to extend the time for our final disposition of the case from October 29, 1970 to November 27, 1970. The trial commenced as scheduled and continued to November 3, 1970. At the conclusion of the trial, we ordered that briefs and proposed Findings of Fact and Conclusions of Law be submitted on November 11th and that replies to those briefs and Findings of Fact be submitted on November 13th. On November 16th we heard oral argument.

After careful consideration of the entire record in this case, we enter the following

## FINDINGS OF FACT, OPINION, CONCLUSIONS OF LAW, AND ORDER

### I. FINDINGS OF FACT

#### A. NATURE OF ACTION AND JURISDICTION.

1. This action was originally brought in three counts by plaintiff, Harold E. Kohn, trustee for the Pension of Harold E. Kohn, P.A., attorneys-at-law, against defendants AMAX and RST. It was brought both as a derivative action on behalf of RST and as a class action on behalf of all shareholders of RST, except AMAX, and principally seeks to enjoin AMAX from acquiring some of the assets of RST remaining after the acquisition of control of RST by the Government of Zambia.

2. Count I was brought under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. In substance, it charges that AMAX conspired with one or more of the directors of RST to perpetrate a fraud on the non-AMAX shareholders of RST and that, pursuant to this conspiracy, they made untrue statements of material fact and omitted to state other material facts necessary to be stated in order to make the statements made not misleading.

3. Count II charged AMAX with the above-mentioned fraud and with a breach of fiduciary duty owed to RST and its non-AMAX shareholders.

4. Count III was brought only as a derivative action on behalf of RST. It charges that the proposed acquisition of RST by AMAX is violative of Section 7 of the Clayton Act, 15 U.S.C. § 18, and that an alleged interlocking of directorates between AMAX and RST is violative of Section 8 of the Clayton Act, 15 U.S.C. § 19.

5. On September 14, 1970 we granted plaintiff leave to file an amended and supplemental complaint, which the plaintiff filed that same day. Essentially, the amended and supplemental complaint asserts the same grounds for relief as the original complaint. However, additional defendants, who are either officers and/or directors of or financial advisers to the defendant corporations, were named.

6. The Court has subject-matter jurisdiction over plaintiff's claim that defendants violated the Securities Exchange Act of 1934 under Section 27 of that Act, as amended, 15 U.S.C. § 78aa.

7. The Court has subject-matter jurisdiction over plaintiff's claim of fraud and breach of fiduciary duty by the defendants under 28 U.S.C. § 1332.

8. The Court has subject-matter jurisdiction over plaintiff's antitrust claims under 15 U.S.C. § 26.

9. Venue is proper in this District under section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1391 (c) and (d), § 1401.

10. This Court has personal jurisdiction over the defendants AMAX and RST.

### B. PRINCIPALS INVOLVED.

11. Plaintiff, Harold E. Kohn, Trustee, for the Pension Plan of Harold E. Kohn, P.A., Attorneys-at-law, holds American depositary receipts representing 2,000 ordinary shares of RST which are listed for trading on the New York Stock Exchange. Plaintiff is a citizen of the Commonwealth of Pennsylvania, resides in the Eastern District of Pennsylvania, and purchased such American depositary receipts on January 14, 1970. (Uncontested Fact No. 1[1]).

12. There are approximately 40,000 shareholders of RST in the United States (See Uncontested Fact No. 10) and United States citizens, other than AMAX, own approximately 37.7% of RST. (Uncontested Facts Nos. 5 and 9). Motions to intervene as party plaintiffs were granted to approximately 265 shareholders of RST, representing approximately 550,000 shares of RST. In our Order of June 8, 1970, we ordered that this action could be maintained as a class action pursuant to Rule 23(c) (1) of the Federal Rules of Civil Procedure.

13. Defendant AMAX, a listed company on the New York Stock Exchange, is a New York corporation with its principal place of business at 1270 Avenue of the Americas, New York, New York, and is licensed to do business in the Commonwealth of Pennsylvania. (Uncontested Fact No. 2). AMAX is a major producer, fabricator and marketer of metals and minerals. AMAX is the owner of 42.3% of the issued shares of RST. (Uncontested Fact No. 5, in part).

14. At the time suit was instituted, defendant RST was a corporation organized and existing under the laws of the Republic of Zambia, with its principal place of business in Zambia. RST's executive office was located at Kafue House, Cairo Road, Lusaka, Zambia; its central and registered office was located at Mpelembe House, Broadway, Ndola, Zambia. RST, since at least 1955, has reported annually to the Securities and Exchange Commission (SEC) on Form 20–K with its Annual Report to shareholders annexed. Its principal business was the production, smelting and refining of copper in Zambia. (Uncontested Fact No. 3).

15. On January 7, 1970, RST organized RST International, Inc., a wholly-owned Delaware subsidiary, for the purpose of externalizing RST's Zambian assets after the nationalization. RST International, Inc., pursuant to an Order of the United States Court of Appeals for the Third Circuit, dated August 31, 1970, entered their appearance as a party defendant in this action on September 25, 1970.

16. The Morgan Guaranty Trust Company of New York (Morgan), the American depositary of RST shares, regularly performs the following functions:

(a) mails annual quarterly reports supplied to it by RST to registered American shareholders of RST (Deposition of Regis E. Moxley, Vice-President of Morgan, p. 6);

(b) distributes cash dividends of RST to American shareholders (Moxley Dep., p. 8);

(c) mails other reports, announcements, documents and circulars of RST to American shareholders (Moxley, Dep., pp. 10–13).

In performing these services, Morgan is paid by RST. The fees paid Morgan by RST for these and other services

---

1. Prior to the hearing in May, 1970, the parties entered into a Stipulation of Uncontested Facts, which was signed by the parties and made a part of the record in this action and was relied upon by this Court in its Opinion and Findings of June 8, 1970. When plaintiff, in his motion for summary judgment, asserted that certain facts had been established as a result of the Stipulation, the defendant objected on the basis that these facts were not *now* uncontested. However, we find that for all purposes of this litigation the Stipulation of Uncontested Facts is binding upon its signatories.

amounted to over $300,000 for the period July 1, 1968 to June 30, 1969. (Plaintiff's Exhibit, hereinafter "PX", No. 22).

## C. NATIONALIZATION OF RST.

17. In the spring of 1968, the Zambian Government announced a limitation of dividends that may be paid outside the country to 50% of net profit. This is commonly referred to as the Mulinguishi Declaration. (Uncontested Fact No. 7).

18. On August 11, 1969, the President of Zambia announced ("Matero Declaration") the desire of the Zambian Government to acquire controlling equity interests in the operating copper properties in Zambia. Thereafter, RST was obliged by the Government to negotiate the sale of 51% interest in the copper producing, smelting and refining businesses conducted in Zambia by certain of its operating subsidiaries. (Uncontested Fact No. 8, in part).

19. Between August 11, 1969, and November 17, 1969, RST's efforts were devoted almost entirely to the intense negotiations with the Zambian Government concerning nationalization. RST's chief concern in the negotiations was to secure the agreement of the Zambian Government to allow RST to transfer its domicile and to externalize its assets. "Externalization" here means the freeing of assets from Zambian exchange controls. (Notes of Trial Testimony, Final Hearing, pp. 369–71).[2] The negotiations were conducted on behalf of RST by Messrs. Jean Vuillequez and R. H. Page, RST's Executive Vice-Chairman and Chief Financial Officer, respectively. AMAX did not formally take part in the negotiations between RST and the Government of Zambia, but was kept advised of the progress of such negotiations by RST, supplied technical assistance to RST in the drafting of proposals, and advised RST of its views as to certain of the issues, particularly urging that the agreement with the Zambian

Government include complete externalization. (PX–151). (Uncontested Fact No. 12, in part). Sullivan & Cromwell, attorneys for both AMAX and RST, took an active part in these negotiations. (DX–50).

20. On November 17, 1969, the RST board met and unanimously approved an agreement in principle to be entered into between the Government, the Industrial Development Corporation of Zambia, Ltd. (INDECO) (a Government corporation) and RST. (Uncontested Fact No. 13, in part). Prior to the execution of the agreement, AMAX had made known to RST its opinion that the agreement was as favorable to RST as could be expected under the circumstances. (Uncontested Fact No. 13, in part).

21. On November 17, 1969, after unanimous approval by the RST Board, Sir Ronald Prain, Chairman of the Board, issued a statement, which was sent to RST stockholders, that RST and Zambia had agreed on the principal terms by which the Government would acquire a majority interest in the mining properties of RST. (Uncontested Fact No. 14, in part; DX–1).

22. On December 22, 1969, a committee of the directors of RST approved the agreement between and among the Republic of Zambia, INDECO and RST. (Uncontested Fact No. 18). The salient provisions of that agreement are:

(a) that the mining operations of RST would be merged into a company to be known as Roan Consolidated Mining, Ltd. (RCM) in which INDECO would own 51 percent, RST 36.75 percent, and the remainder of 12.25 percent by other companies known as the Anglo-American Group because of its minority interest in certain of the RST companies;

(b) that in payment for such operation, INDECO would issue negotiable bonds guaranteed by the Zambian Gov-

2. Hereafter, citation to the Notes of Trial Testimony of the Final Hearing in October will be in the form "N.T.F.H." and citation to the Notes of Trial Testimony of the Preliminary Hearing in May will be in the form "N.T.P.H."

·ernment in the amount of $151,000,000 of which RST would receive 36.75 percent;

(c) that RST, or a company nominated by it, will manage the operations of RCM and act as sales agent for a minimum period of 10 years, for which RST or its nominee will receive one and one-half percent of RCM's gross sales revenue plus two percent of RCM's profits after mineral taxes but before income taxes;

(d) that the holder of the management contract hold not less than 20 percent of RCM stock;

(e) that RCM will pay quarterly dividends not subject to dividend limitation and which will equal the net income of RCM after provision for reserve for exploration and development in an amount approved by the entire board of RCM;

(f) that *all* of the assets of RST except those sold to the Zambian Government may be transferred to a new corporation outside of Zambia and that such assets consist principally of cash of approximately $60,000,000, a 30 percent interest in Botswana RST, Ltd. (BRST), interests in Baluba Mines Limited and certain other exploration companies, the Ametalco group of companies,[3] the aforesaid INDECO bonds *and* RST shares in RCM;

(g) that the acquisition by Zambia of 51% of RST be approved by the RST shareholders. (DX–1; Uncontested Fact No. 19, in part).

D. ACQUISITION OF RST BY AMAX.

23. On August 11, 1969, the date the "Matero Declaration" was announced, Sir Ronald Prain and his colleagues began giving serious consideration to the externalization of RST's assets and mak-

ing RST an international mining house to avoid being "locked in Zambia". It was decided to make externalization a condition to RST's agreeing to the Zambian Government's nationalization plan. (N.T.F.H. 369). In fact, such an "externalization program" was incorporated into the agreement in principle. (See Finding of Fact No. 22(f), *supra*).

24. Between August 11, 1969 and November 17, 1969, Prain did not discuss with anyone except Vuillequez the possibility of RST's becoming an international mining house. Both expressed their concern that such a plan might involve RST's becoming a competitor of AMAX. (N.T.F.H. 378–79).

25. In late November, Prain raised with Ian MacGregor, who is Chairman of the Board of AMAX and a director of RST, the idea of RST's becoming an international mining house. At that time MacGregor noted the possible adverse competitive impact this might have on AMAX and mentioned that the only possible solution would be for AMAX either to sell all or part of its RST shares or to buy all or part of the RST shares it did not already own. (N.T.F.H. 380–81). Prain and MacGregor had no further discussions on this point until December 11, 1969. (N.T.F.H. 383–84).

26. By memorandum to the Directors of RST dated December 10, 1969, Prain recommended, *inter alia*, that all of the RST assets, except cash balances to be externalized to a Luxembourg subsidiary and except those assets to be sold to the Zambian Government, be transferred to a newly formed corporation in another country, most likely the United States or Luxembourg, under the name "RST International" and that RST become an

---

3. AMETALCO, Inc., a New York corporation, is wholly owned by AMETALCO, LTD., a United Kingdom corporation which is wholly owned by another United Kingdom corporation (RSTIM, LTD.) which is a 100% subsidiary of RST. AMETCO Shipping Co., a New York corporation, is wholly owned by AMETALCO, Inc., which was purchased by RST from AMAX in 1963 for a consideration of one million shares of RST.

The Chairman of the Board of AMETALCO, Inc., is Sir Ronald Prain, who is also chairman of the Board of RST and a director of AMETALCO, Inc., AMETCO Shipping Co., and RST; Jean Vuillequez, Executive Vice-Chairman of RST is also a director of those three companies and is chairman of the Board of AMETCO Shipping Co. (Uncontested Fact No. 4, in part).

international mining company. (PX–3; N.T. 444, 450–51). He also stated that the major shareholder (AMAX) had requested him to become chairman of the international corporation. (PX–3). The RST management had concluded that the formation of an international mining company would be accompanied by a distribution to RST shareholders of some cash and all the Zimco bonds. The RST management had so concluded because it felt that RST had a moral obligation both (1) to distribute to its shareholders that which RST had received (i. e., the Zimco bonds) for Zambia's taking over 51% of the company and (2) to distribute some cash to make up for dividend restrictions imposed by Zambia in the past as well as to provide additional compensation for the take-over. The management also concluded that distributing the Zimco bonds to stockholders all over the world would minimize the political and economic risk of default by Zambia in the payment of principal or interest. (N.T.F.H. 374–75, 1284–87).

27. On December 11, the RST board met and unanimously approved Prain's recommendations. Ian MacGregor, who is Chief Executive Officer and Chairman of the Board of AMAX and a director of RST, was present at that meeting and approved such resolution. (PX–3; PX–27; Uncontested Fact No. 16, in part).

28. On that same day, December 11, 1969, MacGregor proposed to Prain an amalgamation of RST and AMAX. His purpose in so doing was to protect AMAX's investment in RST. (N.T.P.H. 386). One of AMAX's primary reasons for seeking to amalgamate with RST was to acquire RST's cash for AMAX's own requirements in financing its foreign investment projects in the production of nickel and bauxite. AMAX anticipated that it would be short of capital because of these extensive projects. (PX–5, pp. 8–9; PX–57 [3a]). MacGregor's proposal en-

visioned a "distribution to the non-AMAX shareholders of RST of certain of the RST assets and some type of debenture from AMAX to make up whatever value was negotiable." (N.T.F.H. 384). Prain asked whether the AMAX debentures could be substituted with AMAX common stock, but this suggestion was totally dismissed as a possibility by MacGregor. (N.T.F.H. 557–58). MacGregor did not represent to Prain that this amalgamation proposal had the authorization of the AMAX board.

29. On December 19, 1969, RST's management retained N. M. Rothschild & Sons, London merchant bankers, to advise RST in its discussions with AMAX. (N.T.P.H. 192–93, 160–61). In these negotiations, AMAX was advised by Lehman Brothers, New York investment bankers. On January 17, 1970, RST retained Kuhn, Loeb & Co., New York investment bankers, to work jointly with Rothschild's. (N.T.P.H. 503–08). The negotiations were held over a period of approximately 2½ months, culminating on March 5, 1970, when the parties entered into an Agreement in Principle for the amalgamation of AMAX and RST. (PX–9; Uncontested Fact No. 5).

30. The two persons who were authorized by AMAX to negotiate on its behalf were MacGregor and Donahue (President of AMAX), who both were and are members of the RST board. (PX–7). Also intimately involved in the negotiations for AMAX was Harold K. Hochschild, a member of both the AMAX and RST boards, and former President and Chairman of the Board of AMAX. (N.T.F.H. 1032–36). Aside from its investment bankers, RST was represented in the negotiations by *inter alia*, Prain, Jean Vuillequez and R. H. Page, a director and Vice-President of RST. (N.T.F.H. 309, 508).

31. Throughout these negotiations, MacGregor felt that non-AMAX shareholders of RST were being more than amply represented by RST directors oth-

---

**3a.** Since we are satisfied that PX–57 is an internal AMAX memorandum, we

have admitted it into evidence over defendants' objections.

er than himself. (N.T.P.H. 395). In the process of negotiation, MacGregor's sole concern was for the interests of AMAX. (N.T.P.H. 386; N.T.F.H. 919). This concern was shared by Harold Hochschild, who considered himself part of the AMAX negotiating team only. (N.T.F.H. 1036).

32. During the course of negotiations many avenues were explored. Since Prain felt that the best course for RST would be to become an international mining house, and since he was aware of AMAX's objections to this plan for competitive reasons, RST offered, in early January, 1970, to buy out AMAX's total interest in RST. (N.T.F.H. 392–406). MacGregor summarily dismissed this proposal. (N.T.F.H. 406, 425).

33. RST felt that their proposal for a total buy-out of AMAX's interest was too hastily dismissed by MacGregor and, thus, in late January or early February, 1970, again offered this proposal together with a plan to buy-out a part of AMAX's interest. Also, at this time, RST again presented a plan to become an international mining house. (N.T.F.H. 417–26).

34. AMAX, principally through Mac-Gregor, again rejected any buy-out of its interest by RST. (See N.T.F.H. 822–28; DX–14, p. 6).

35. On the other hand, AMAX proposed two plans, to wit: (1) a total liquidation of RST which would have reduced RST to a mere management company in Zambia and (2) an amalgamation of AMAX and RST whereby AMAX would substantially increase its percentage holding in RST by buying-out the public shareholders interest in RST. (N.T.F.H. 428). Prain rejected the total liquidation proposal out of hand since he and his non-AMAX colleagues felt that such a proposal was not in the interests of RST stockholders. (N.T. F.H. 428–29).

36. At this juncture RST investigated the possibility of amalgamating with a company other than AMAX. However, RST was advised by its investment bank-

ers that, in their opinion, there was no such company. (N.T.F.H. 429, 433–34).

37. Thus, in early February, 1970, the only alternatives open to RST were amalgamation with AMAX or becoming an international mining house. At this time, Prain remained steadfast in the view that the best course for RST would be to become an international mining company, knowing full well, however, that such a course would be totally unacceptable to AMAX. (N.T.F.H. 392, 407, 559; see Finding of Fact Nos. 25, 32, *supra*).

38. On or about February 26, 1970, Prain concluded that the best interests of RST lay in an amalgamation with AMAX rather than in becoming an international mining company. (N.T.F.H. 392–93). The reasons given for Prain's change of mind were: (1) he was advised by RST's investment bankers that if RST were to become an international mining house (a) its borrowing power would be limited (N.T.F.H. 393–95) and (b) consequently, RST would have to generate capital internally and would have less earnings available for distribution to stockholders as dividends (N.T. F.H. 395); (2) becoming an international mining house would involve competing with AMAX (N.T.F.H. 400); (3) RST was orally advised on February 19, 1970, by its tax counsel, Wayne C. Chapman, Esquire, of Cravath, Swaine and Moore, that if RST were to be domiciled in either Luxembourg or in the United States and if there were to be a distribution, as contemplated, of cash and Zimco bonds (N.T.F.H. 395–399), such a distribution would result in an unequal tax impact on different classes of RST shareholders. (N.T.F.H. 1157–62). An additional reason given by RST's investment advisers, but not subscribed to by Prain, was that RST's management had not been created to develop an international mining house nor could they have attracted such talent. (N.T.F.H. 746).

39. RST and its investment advisers did consider the consequences of RST's becoming an international mining house without making a distribution of cash

and Zimco bonds to RST shareholders but concluded that this avenue was unacceptable for the reasons previously outlined (see Finding of Fact No. 26) as well as for other tax problems which the failure to make a distribution would create. (N.T.F.H. 1284–87). RST's tax counsel, Mr. Chapman, was never requested to render any opinion as to the tax impact on the shareholders if RST were to become an international mining house without making a distribution. (N.T.F.H. 1172–73).

40. It was at this time, on or about February 26, 1970, that RST's management began for the first time to seriously consider amalgamation with AMAX and to come to grips with the problem of negotiating its terms. (N.T.F.H. 401).

41. For this purpose, *inter alia*, the RST board met on February 28, 1970, and adopted the following resolution:

That a committee of any two of Sir Ronald Prain, Mr. J. Vuillequez and Mr. R. H. Page be appointed to settle any such amalgamation if an offer on the lines discussed was forthcoming.

(Uncontested Fact No. 26; PX–79).

41(a). In the event that the negotiations with AMAX concerning amalgamation did not result in an agreement, RST, as late as March 4, 1970, was giving serious consideration to implementing the previously agreed upon international mining house plan (See Finding of Fact Nos. 26, 27, *supra*), albeit in its modified "twinning" form. (N.T.P.H. 472–75). The twinning concept involved leaving the RCM stock and some other assets in a Zambian corporation, creating a new Luxembourg corporation wholly independent of the Zambian corporation to hold the cash and other externalized assets and distributing to the shareholders single share certificates representing stockholdings in both companies. (PX–33). The hoped for effect of the twinning proposal was to preserve for the RST stockholders the tax credit they enjoyed as result of a tax treaty. AMAX's strong opposition to the "twin-

ning" plan forced RST to realistically view it as an alternative only if amalgamation with AMAX could not be worked out. (PX–5, Appendix, p. 10).

42. One day later, on March 5, 1970, the Agreement in Principle for the amalgamation of AMAX and RST was signed by Mr. Ian MacGregor of AMAX and Mr. H. J. Hinves of RST. (Uncontested Fact No. 25; PX–39). Prior to the execution of the agreement, RST's investment bankers orally advised RST's board of directors that the proposed reorganization was fair and equitable and in the best interests of RST stockholders and that it was preferable to other reorganization proposals which had been considered. (N.T.P.H. 167–68, 452, 508).

43. At a March 5, 1970 meeting, the board of AMAX approved the Agreement in Principle unanimously. The members of AMAX who were either directors or alternate directors of RST abstained from such vote on advice of counsel although they stated they would support adoption of said plan. (Uncontested Fact No. 28).

44. The committee authorized by the RST board meeting of February 28, 1970, consisted of Vuillequez and Page. This committee met on March 6, 1970, and voted on behalf of RST to accept the Agreement in Principle to amalgamate with AMAX. (Uncontested Fact No. 29; N.T.F.H. 508).

45. In essence, the Agreement provides for the consolidation of RST's Zambian operating assets into RCM, a Zambian corporation, 51% of which will be sold to INDECO for INDECO bonds, pursuant to the agreement of December 24, 1969 with the Government of Zambia; pro rata distribution to all RST shareholders of the INDECO bonds thus acquired; pro rata distribution to all RST shareholders of RST's shares of Botswana RST Limited; pro rata distribution to all RST shareholders of the shares in RCM, except to the extent that the Zambian Government has required 20% of the RCM shares to be retained

by RST, and acquisition of the remainder of RST by AMAX, for which AMAX will pay to other RST shareholders approximately $76.2 million principal amount of 8% AMAX subordinated debentures with common stock warrants attached and $6.3 million in cash. (PX–9).

46. More specifically the Agreement in Principle provides for the following (PX–6; PX–9; DX–6A):

Non-AMAX shareholders of RST, who own 25.4 million or 57.7% of the total RST shares will receive the following in complete redemption of their shares:

(a) $6.3 million in cash, representing $.25 per RST share;

(b) Their approximate pro rata share ($2 principal amount per RST share) of the 6% Zimco bonds;

(c) Approximately 16.75% of the shares of RCM;

(d) Their pro rata share (57.7% of RST's 30.2%) (947,401 shares) of Botswana RST Limited, which has a controlling interest in a proposed Botswana copper-nickel mining venture;

(e) Approximately $76.2 million principal amount ($3 principal amount per RST share) of 8% AMAX debentures, subordinated to all present and future AMAX debt, due January 1, 1986, with one seven-year AMAX common stock warrant attached to each $100 principal amount of debentures. The warrants will be exercisable at $47.50 per share and will be detachable and exercisable six months after issuance.

After the reorganization, RST will be a wholly-owned subsidiary of AMAX and RST will own the following:

(i) Approximately 42.3% of $40 million principal amount of the Zimco bonds to be received by RCM;

(ii) 42.3% of RST's present interest in Botswana RST;

(iii) 20% of the shares of RCM;

(iv) 100% of the Ametalco group of companies;

(v) The contracts to manage the RCM mines and to sell their output pursuant to previously announced agreements in principle with the Zambian Government;

(vi) Miscellaneous exploration and other assets both inside and outside of Zambia; and

(vii) Net current assets of approximately $63 million remaining in the RST Group, based on estimated January 1, 1970 figures.

At the time of the Agreement, AMAX anticipated that it would receive, *inter alia,* the following benefits as a result of the Agreement in Principle between RST and AMAX:

(a) AMAX's annual income would be increased by $8.7 million calculated at a $.50 per pound copper price [4] (PX–5, p. 1; N.T.F.H. 1096–97);

(b) AMAX's cash flow would be improved by $134 million over a period of 1970–1975;

(c) AMAX's foreign balance of payments position would be improved by $91 million;

(d) Although AMAX would increase its net exposure in Africa by about $24 million, 4½ years of incremental earnings after the acquisition would recoup this (PX–5, p. 1);

(e) AMAX would be acquiring high yielding assets (PX–5, p. 6).

46(a). The Agreement between RST and Zambia granted RST discretion regarding adopting a plan for externalization and set no time limit for this purpose. (DX–1, p. 5). The Zambian Government had also indicated its willingness to cooperate in any plan of externalization which RST might devise, subject of course to any of the requirements in the aforesaid Agreement. (PX–64, p. 10). There was no requirement that nationalization and externalization had to proceed simultaneously. In fact, the Zambian Government indicated a strong desire to effectuate nationalization without much

---

4. Between January 9, 1970 and May 4, 1970, the closing bids for cash on the London Metal Exchange for electrolytic copper wirebar ranged between 71.46 cents and 78.38 cents per pound. (Uncontested Fact No. 35).

delay and to have the externalization plan follow later. (PX–86; PX–138).

47. For the agreement between AMAX and RST to take effect, it had to be adopted by the vote of the holders of three-quarters of all RST shares represented in person or by proxy at the shareholders' meeting scheduled for August 6, 1970. (Zambia Companies Ordinance, §§ 14, 104 (1965)). Prior to our Opinion of June 8, 1970, counsel for AMAX represented to the Court that RST would also present, for a separate vote, the agreement and amalgamation to the non-AMAX shareholders of RST voting as a class. Even though no prescribed vote of this separate class was required for approval under the Zambia Companies Ordinance and even though the Agreement in Principle between AMAX and RST (PX–9) made no specific mention of this special vote, counsel had assured us that the reorganization would not be consummated unless it were approved by a majority of the non-AMAX shareholders participating in the class vote. *See, e. g.,* Defendant's Trial Memorandum, p. 24.

48. On or after July 8, 1970, the RST stockholders were sent an Explanatory Statement with Appendices containing information intended to allow the stockholders to make an informed decision whether or not to approve the amalgamation with AMAX. The Explanatory Statement and Appendices contained approximately 200 pages of highly complex and technical financial and legal data. Accompanying these materials was a cover letter, dated July 7, 1970, from Sir Ronald Prain to the shareholders (PX–41) stating, *inter alia,* that in the opinion of the RST board the proposed amalgamation with AMAX was in the best interests of RST and urged them to vote in favor of the Resolutions. Also accompanying these materials was a one page letter, dated July 7, 1970, from the plaintiff to the RST shareholders (Court Exhibit 2) setting forth plaintiff's contentions in this lawsuit. (See also PX–45).

49. Included in the materials sent to the stockholders was a proxy card or instruction form (PX–44) upon which the stockholders could authorize Morgan Guaranty Trust Company, the American Depository, either to vote for or against the amalgamation and nationalization, both of which were presented as one resolution and could not be voted upon separately.

50. RST's management actively sought to obtain stockholder approval for the proposal by taking the following steps: (1) hiring firms to solicit proxies (PX–42, p. 20; PX–148); (2) when shareholders instructed the American Depositary to vote against the proposal, a letter was sent over Prain's signature requesting that they give further consideration to the proposal and reiterating Prain's firm conviction that the proposal was in the best interests of all shareholders of RST. Enclosed in Prain's additional solicitation was another Instruction Form and return envelope, with postage affixed. (PX–46).

51. On August 6, 1970, the shareholders voted on the resolutions for nationalization and amalgamation with AMAX. The recorded vote of all RST shareholders present and voting showed 85.5% in favor and 14.5% opposed. At a separate meeting of non-AMAX RST shareholders, the resolutions passed with 66% in favor and 34% opposed. (DX–27, pp. 2–3).

52. On August 14, 1970, the High Court of Zambia approved the Reduction of Capital necessary for amalgamation. (DX–27(Y)). On August 15, 1970, the High Court's approval of the Reduction of Capital was registered. (DX–28). The effect of the registration of the Court's Order was to cancel and render void all issued shares of RST other than those held by AMAX and its nominees. (See Affidavit of John G. Harkins, Jr., Esq., filed August 12, 1970; Affidavit of David Ffinlo Quirk, filed September 24, 1970). Then the RST Board of Directors adopted resolutions authorizing the distribution to shareholders other

than AMAX of the cash and securities described in the Explanatory Statement.

## E. INTERESTS OF DIRECTORS, ADVISING BANKERS AND OTHERS.

53. AMAX owns 42.3% of RST. (Uncontested Fact No. 5).

54. Selection Trust, Ltd. (Selection), together with its subsidiaries, owns 11.-8% of AMAX. (PX–42, p. 5).

55. Charter Consolidated, Ltd., (Charter) and its subsidiaries, own approximately 27% of Selection Trust, Ltd. (PX–42, p. 13).

56. At all times material to this action, RST had 13 directors, six of whom were and are directors of AMAX. Of the six common directors, three are present and two are former officers of AMAX; the other seven directors of RST, including the Chairman, Executive Vice-Chairman and the President of RST, are neither directors nor officers of AMAX. (Uncontested Fact No. 5, in part). Four of RST's directors are also directors of Selection Trust, Ltd. (PX–43, p. O–1).

57. Sir Ronald Prain, Chairman of the Board of RST, is also a director of Selection, in which he owns 4,875 shares. (PX–43, p. O–1, 2). Prain has been retained by AMAX as chairman-designate of RST, International, Inc., and owns 2,-250 shares of AMAX and 6,000 shares of RST. (N.T.F.H. 340; PX–43, O–1–2).

58. Jean Vuillequez, an RST director and one of the principal negotiators for RST in the AMAX negotiations, was employed by AMAX from 1917 through 1963. During that time, he held various offices in AMAX and, from 1956 through 1963, was a member of both the Executive Committee and the Board of Directors of AMAX. Vuillequez came to RST in January, 1964. (N.T.F.H. 350, 503, 507–08). He is the owner of 26,169 shares of AMAX, worth approximately $1 million, and 16,236 shares of RST, worth approximately $80,000. (PX–43, O–1, 2).

59. James L. Reid, a director of RST owns 412 shares of AMAX and 400 shares of RST. (PX–43, O–1, 2).

60. Donald J. Donahue, one of the principal AMAX negotiators in its negotiations with RST, is a director of RST as well as being a director and President of AMAX. Donahue owns 8,529 shares of AMAX and 800 shares of RST, which are beneficially owned by AMAX, are held in his name. (PX–43, O–1, 2).

61. Eric J. T. Goudie is a director of RST, in which he owns 800 shares, and Selection, in which he owns 13,785 shares. (PX–43, O–1, 2).

62. H. J. Hinves, who, on behalf of RST, signed the Agreement in Principle with AMAX, is a director of RST and Selection. He owns 351 shares of AMAX, 808 shares of RST, and 891 shares of Selection. (PX–43, O–1, 2).

63. Harold K. Hochschild, who was part of the AMAX negotiating team in its negotiations with RST, is both a director of RST and AMAX. From 1947 to 1957, Hochschild was Chairman of the AMAX Board and, together with other members of his family, owns approximately 10% of all the AMAX stock. Personally, Harold Hochschild owns 627,-450 AMAX shares, and 800 shares of RST, which are beneficially owned by AMAX, are held in his name. (N.T.F.H. 822–23, 1032, 1036; PX–43, O–1, 2).

64. Walter Hochschild is a director of both RST and AMAX. He owns 145,809 shares of AMAX, and 800 shares of RST, which are beneficially owned by AMAX, are held in his name. (PX–43, O–1, 2).

65. Ian K. MacGregor, who is Chairman of the Board and Chief Executive Officer of AMAX, is also a director of RST. MacGregor, who was one of the principal AMAX negotiators in its negotiations with RST, owns 26,651 shares of AMAX, and 800 shares of RST, which are beneficially owned by AMAX, are held in his name. (PX–43, O–1, 2).

66. R. H. Page, executive vice-president and chief financial officer of RST, is also a director of RST. Page was one

of RST's principal negotiators in its negotiations with the Zambian Government and AMAX. He owns 1,654 shares of RST. (N.T.P.H. 439–40, 453; PX–43, O–1, 2).

67. John Payne, Jr., an AMAX vice-president, is both a director of RST and AMAX. He owns 13,023 shares of AMAX, and 800 shares of RST, which are beneficially owned by AMAX, are held in his name. (PX–43, O–1, 2).

68. H. J. Wedgwood is a director of RST and owns 400 shares of RST. (PX–43, O–1, 2).

69. E. C. Wharton-Tigar is a director of RST, AMAX and Selection. He owns 1,500 shares of AMAX, 800 shares of RST, and 9,000 shares of Selection. (PX–43, O–1, 2).

69(a). AMAX controls RST because of its 42.3% stock interest in RST and because of its domination of the RST Board of Directors. (See, e. g., PX–5, App., p. 10).

70. N. M. Rothschild & Sons was first retained as adviser to RST when AMAX held 51% of the stock of Rhodesian Selection Trust Company, a predecessor of RST. (N.T.F.H. 741–42). During the past two years, Rothschild's has acted for AMAX in acquiring and selling shares in financial markets and the total compensation paid by AMAX to Rothschild since January 1, 1967 has aggregated approximately $46,500. (PX–42, p. 6). A partner in Rothschild's is a director of Charter Consolidated Limited, and on May 1, 1970, that firm and its partners held beneficially 126,000 shares of Charter. (PX–42, p. 13). The aggregate fees of Rothschild and Kuhn, Loeb & Co., for their advice and assistance to RST in the negotiations with AMAX, were approximately $1,000,000, exclusive of services in connection with judicial proceedings. This fee was to be paid by AMAX if the amalgamation were effectuated; otherwise, the cost would be borne by RST. (PX–42, p. 6; N.T.F.H. 577–78).

71. Since August 26, 1969, and throughout the negotiations with Zam-bia, Sullivan & Cromwell (S & C), which had represented RST and AMAX for over 35 years, advised RST as to the terms of both an agreement with the Zambian Government and forms of reorganization, all of which included externalization. Sullivan & Cromwell had the main responsibility for drafting the RST agreement with Zambia. (PX–90; PX–107, PX–134, p. 2; DX–50, 1–3; Answer to Interrogatory No. 36(17)). Arthur H. Dean, senior partner in Sullivan & Cromwell, has been a director of AMAX since 1945. (DX–50, 1).

## F. VALUATION.

72. As of March 5, 1970, the date the Agreement in Principle between AMAX and RST was signed, Kuhn, Loeb ascribed the following values to RST's assets:

| | |
|---|---|
| Net Current Assets | $69.5 million |
| INDECO Bonds | 54.1 million |
| RCM Shares | 120 million |
| Botswana Shares | 22.7 million |
| Ametalco | 13 million |
| Management Contract | 12.5 million |
| Exploration Areas, Miscellaneous Investments in African Securities, Etc. | 20 million |
| TOTAL | $311.8 million |

(DX–43, II).

73. In exchange for the AMAX debentures and warrants, valued at $76.2 million, the public shareholders gave up their pro rata share (i. e. 57.7%) of RST's net current assets ($33.8 million), a small amount of Zimco bonds ($.7 million), 4½% of RCM ($14.5 million), and their proportionate interests in Ametalco ($7.5 million), the management contract ($7.2 million), exploration rights and other miscellaneous assets ($11.5 million), for a total of $75.2 million. All of the above valuations were made by Kuhn, Loeb as of March 5, 1970. (DX–43, II).

74. The valuation by RST's investment advisers of the AMAX debentures and warrants at $76.2 million on March 5, 1970, was too high. A $100 face value 8% subordinated debenture of AMAX was ascribed a value by Kuhn, Loeb of

$88, and the attached warrant [5] was valued between $10 and $12. (N.T.P.H. 558–59; N.T.F.H. 1352–53, DX–6C, D). Or, in other words, the package of debenture and warrant was valued to sell at or below par (i. e. $100). Rothschild valued the package to sell at par or slightly under par, in a range of $98 to $100. (N.T.F.H. 767–69). On March 4, 1970, Rothschild valued an AMAX debenture with the warrant exercisable at $50, at $93. (PX–31; N.T.P.H. 197, 300).

75 Thus, the seller's (RST's) financial advisers, after valuing the buyer's (AMAX's) package as ranging between $93 and $100, nonetheless ascribed the highest value to the buyer's package.

76. For every $1 less than $100 that an AMAX debenture with warrant was valued, the total value ascribed to what AMAX was paying for the RST assets decreases by $762,000.

77. On the first day on which quotations are available, September 17, 1970, an AMAX debenture with warrant was quoted at $85½ bid and $87½ asked. (DX–43, XV).

78. The valuation on March 5, 1970, by RST's investment advisers of the total value of RST's miscellaneous assets purchased by AMAX was too low.

79. RST's investment advisers, Rothschild and Kuhn, Loeb, assumed the accuracy of all information and statements contained in the Explanatory Statement and did not make an independent survey or appraisal of RST's mining properties, mineral reserves, or exploration rights. (PX–43, Q–1, 2).

80. On March 5, 1970, RST's investment advisers valued the so-called miscellaneous assets, including Fiji and the Baluba orebody, at $20 million. (DX–43, I, VIII). On January 10, 1970, Rothschild had evaluated these same assets at $33 million to $50 million. (PX–30).

81. On March 5, 1970, Rothschild and Kuhn, Loeb valued RST's mining exploration project in Fiji at $600,000, which represents the amounts expended by RST on the project up to December 31, 1969. (DX–43, VIII; N.T.F.H. 763–65; PX–43, I–5). The $600,000 figure places no value on the fact that a geological report, after preliminary surveys, most strongly recommended that exploration in Fiji continue since all the conditions were right for occurrence of porphyry copper over huge areas of high mineral potential. (PX–117; PX–140). On the basis of this encouraging report, RST approved further expenditures for the Fiji program for the rest of 1970 of $350,000. (PX–43, I–5). Further, RST agreed to finance the acquisition of mining rights over additional areas on Fiji, with an estimated expenditure over a period of time of $165,000. (PX–43, I–5).

82. The geological report on Fiji was prepared on December 9, 1969. (PX–140). At the AMAX–RST meetings held from January 9 through 11, 1970, Sir Ronald Prain estimated the value of Fiji at $25 million, whereas Vuillequez estimated it at $1 million. (DX–14). A contemporaneous Rothschild estimate, prepared on January 10, 1970, valued Fiji at between $15 million and $20 million. (PX–30, p. 2; N.T.P.H. 299–301).

83. On March 5, 1970, Rothschild and Kuhn, Loeb valued RST's Baluba orebody at $4 million (DX–43, VIII), which is the approximate amount expended by RST on the project up to December 31, 1969. (N.T.F.H. 763, 1324, 1327).

84. During the first quarter of 1970, an additional $2.16 million was expended on the Baluba project. (PX–43, I–1).

85. During the meetings held between January 9 and 11, 1970, RST and its financial advisers reasonably evaluated Baluba, on a discount cash flow analysis, as worth between $4 million and $8 mil-

---

5. A seven-year AMAX common stock warrant was attached to each $100 principal amount of debentures. The warrants are exercisable at $47.50 per share and are detachable and exercisable six months after issuance.

lion. (PX–30; DX–14). Another discount cash flow analysis, upon which we place little weight, ascribed a negative value of up to $4 million for Baluba. (DX–30 in conjunction with PX–43, I–1; N.T.F.H. 763–64; 1317–30). During that weekend session, Rothschild and AMAX tentatively agreed that Baluba was worth $6 million. (DX–14).

86. A confidential study prepared by AMAX for calendar year 1969 estimated the cost of the Baluba project at $44.8 million, to produce approximately 1.8 million tons of copper of 2.71% at a per pound cost of 28.5 cents. (N.T.F.H. 1485). It is expected that the Baluba operations will be profitable by 1974. (PX–43, I–1).

87. In contrast, the cost of the Puerto Rican project, a joint venture between AMAX and Kennecott, was estimated by AMAX at $110 million to produce 910,-000 tons of copper of .65% at a per pound cost of 33.06 cents. (N.T.F.H. 1484).

88. On March 5, 1970, Kuhn, Loeb and Rothschild valued RCM at 4.3 times 1969 pro forma earnings (which were unusually high due to the sale of stockpiles) or 5.9 times average 1967–69 pro forma earnings to arrive at a $325 million evaluation, or a $120 million evaluation of RST's 36.75% interest in RCM. On this basis, the 4½% disproportionate interest in RCM which AMAX acquired from RST's public shareholders was worth $14.5 million.

89. On January 10, 1970, Rothschild evaluated RST's interest in RCM from between $126 million and $202 million, using multiples of 5 and 8, respectively. (PX–30).

90. As of March 5, 1970, the average price/earnings ratio of leading copper companies was 11.2. (DX–43, IV).

91. The RCM management contract, which was for a minimum term of 10 years, was valued on March 5, 1970, by RST advisers at five times estimated annual earnings of $2.5 million, or $12.5 million, and the 57.7% interest therein to be acquired by AMAX was valued at $7.2 million. (DX–1; DX–43, I). In late January, 1970, this 57.7% interest in the management contract had been valued by AMAX at $9 million and by Rothschild at $11.6 million. (PX–13).

92. The Ametalco group of companies and the sales contract with RCM was valued by RST's advisers at five times estimated annual earnings of $2.6 million, or $13 million. On this basis, the 57.7% interest to be acquired by AMAX was valued at $7.5 million. (DX–43, I, II). In late January, 1970, this 57.7% interest in Ametalco had been valued by AMAX at $9 million and by Rothschild at $11.6 million. (PX–13).

93. On July 11, 1969, AMAX valued Ametalco at between 5 and 15 times earnings. (PX–83). Later, on September 4, 1969, shortly after the "Matero Declaration", AMAX valued RST International Metals Ltd. (RSTIM), of which Ametalco was a wholly-owned subsidiary (See Footnote 3, *supra*) at 8 to 10 times average earnings of $2.9 million for the period 1965 to 1968. (PX–85(a), p. 2). Ametalco's earnings make up approximately 90% of RSTIM's earnings. (PX–83, p. 1; PX–85(a)).[6]

94. On January 10, 1970, Rothschild valued RSTIM at between 7 and 10 times estimated annual earnings of $2.3 million. (PX–30).

95. The following chart indicates the range of values ascribed by the parties,

6. Since we are satisfied that PX–83 and PX–85(a) are internal AMAX memorandums drafted for AMAX employees concerning the amalgamation in question, we have admitted them over defendants' objections.

negotiators or advisers to the RST assets acquired by AMAX:

| | Lowest Estimated Value | (Millions) Highest Estimated Value | Agreed Upon Value [1] |
|---|---|---|---|
| Net Current Assets | 69 [2] | 69.5 | 69.5 |
| INDECO Bonds | 54.1 | 72 [3] | 54.1 |
| RCM Shares | 120 | 202 [4] | 120 |
| Botswana Shares | 22.7 | 22.7 | 22.7 |
| Ametalco | 13 | 48 [5] | 13 |
| Management Contract | 12.5 | 20 [6] | 12.5 |
| Miscellaneous Assets | 12.7 [7] | 55 [8] | 20 |
| TOTAL | $303.3 | $489.2 | $311.8 |

[1] See DX–43, II; Finding of Fact No. 72, *supra*.
[2] See PX–30.
[3] See PX–30.
[4] See Finding of Fact No. 89, *supra*.
[5] See Finding of Fact No. 93, *supra*.
[6] See Finding of Fact No. 91, *supra*.
[7] See Finding of Fact No. 85, *supra*.
[8] See Finding of Fact Nos. 82, 85, *supra*; PX–30.

96. The non-AMAX shareholders of RST did not receive fair value for the RST assets purchased by AMAX pursuant to the amalgamation.

## G. DISCLOSURE IN THE EXPLANATORY MATERIALS.

97. The following facts, which are material and would have a bearing on a prudent man's voting for or against the proposals presented, were not disclosed in the materials sent to the RST stockholders:

(a) the identity and interest of the RST officers and directors who acted on behalf of RST in the negotiations with AMAX; [7]

(b) that the law firm of Sullivan & Cromwell, general counsel to AMAX, represented both RST and AMAX for over thirty-five years, and during the period of negotiations with Zambia, while representing AMAX, advised RST as to the terms of both an agreement with Zambia and a form of reorganization, which included externalization, and had the main responsibility of drafting the agreement with Zambia. (PX–90, PX–107, PX–134, p. 2; DX–50 at pp. 1–3)

7. Disclosure is made in the Appendices to the Explanatory Statement of MacGregor's and Donahue's roles on behalf of AMAX. (PX–43, R–4, Finding No.

98. The following material facts, which would have a bearing on a prudent man's voting for or against the proposals presented, although disclosed, were not fully, fairly and adequately disclosed in that they are insufficiently brought to the shareholder's attention, especially in light of the length, complexity and detail of the Explanatory Statement and Appendices:

(a) the expected benefits AMAX will receive from the amalgamation;

(b) the investment bankers, who advised RST that the amalgamation was fair to all RST shareholders, did not make any independent survey of the RST Group's mining properties, mineral reserves, or exploration rights, and assumed the accuracy of all the information and statements contained in the Explanatory Statement;

(c) the interest of the RST directors, investment advisers, and other principals;

(d) the composition of the AMAX negotiating team.

99. The following facts, which are material and would have a bearing on a prudent man's voting for or against the proposals presented, were not disclosed in the explanatory materials:

(a) under Zambian law, shareholder approval was not required or necessary to effectuate the nationalization of 51% of RST's operating properties in Zambia;

(b) under the terms of the Agreement between Zambia and RST (DX–1), RST had the discretion to transfer its assets to a non-Zambian holding company (*i. e.* "externalize") or to hold its assets in Zambia;

(c) there is no time limit in the Agreement between Zambia and RST (DX–1) with respect to when the exter-

26). As we will find below, this reference was inadequate. (See Finding of Fact No. 98(d), *infra*).

nalization of the non-Zambian assets must be accomplished;

(d) that there were alternatives, other than amalgamating with AMAX, available to RST and that, in fact, one such alternative, RST's becoming an international mining house, had been approved by the RST Board (See Finding of Fact Nos. 26, 27 *supra*), and a restructured form of that alternative, the "twinning" plan, was set up as a fallback position if the amalgamation with AMAX were not approved. (See Finding of Fact No. 41 (a), *supra*).

100. The explanatory materials, by not disclosing those material facts set out in Finding of Fact No. 99, *supra*, coupled with statements made therein, namely

"This Explanatory Statement describes the proposal of the RST Board that the shareholders of RST approve this sale to Zimco *as part* of their approval of a reorganization of the structure of the RST Group * * *" (PX–42, p. 1). (Emphasis supplied)

"At an early stage of this consideration AMAX raised with RST the possibility of an amalgamation of part of the RST Group into AMAX, with a distribution of other RST assets and AMAX securities to the other RST shareholders, as a means of effecting a reorganization to meet the foregoing considerations * * *."
(PX–42, p. 2)

"Approval is being sought from RST shareholders of the foregoing proposal as a whole. Under the law of Zambia, this proposal, since it involves a reduction of capital of RST, cannot become effective unless confirmed by the High Court for Zambia after it has been approved by the shareholders of RST by a special resolution * * *"
(PX–42, p. 2)

Accordingly, this distribution will enable such RST shareholders to the maximum extent permitted to continue an interest in the Zambian mining operations directly and subject to generally the same tax laws and treaty considerations as pertain to their present RST shares (See Appendix M) while receiving the other assets being distributed to them free of Zambian exchange control restrictions; and to the extent RST shareholders obtain Amax common stock by exercising the Amax warrants being distributed, they will secure through Amax an interest in such portion of RCM as Amax may then own."
(PX–42, p. 4)

"The Board believes that it has a duty to point out to shareholders that, if the Resolutions are not approved by the shareholders, the Board of RST must continue to work with representatives of Zambia for the acquisition by Zambia of a 51% interest in the Zambian mining, smelting and refining operations of its subsidiaries in accordance with the announced policy of Zambia to acquire such an interest. The Board believes that the results of such a course would be substantially less in the interests of shareholders than the present proposal."
(PX–42, p. 5)

render the Explanatory Statement and Appendices materially misleading in that a shareholder would be led to believe, contrary to actual fact, that the amalgamation with AMAX was an inevitable consequence of the nationalization of RST and was the only possible way of complying with the Agreement between Zambia and RST.

101. The explanatory materials failed to disclose why the proposal to nationalize and the proposal to amalgamate with AMAX were linked for purposes of voting into one shareholder resolution. This material fact would have a bearing on a prudent man's voting for or against the resolution.

102. The manner of presenting the nationalization and amalgamation proposals to the stockholders in the form of a single resolution was itself a manipulative scheme designed to coerce stockholder approval of the amalgamation with AMAX.

103. The Explanatory Statement and Appendices failed to disclose adequately the evaluation given to the RST assets which AMAX acquired and the basis for these evaluations. These facts are material and adequate disclosure of them were necessary for an informed shareholder decision whether to vote for or against the proposals presented.

104. The following statement appears on page 5 of the Explanatory Statement (PX–42):

"The Board believes that it has a duty to point out to shareholders that, if the Resolutions are not approved by the shareholders, the Board of RST must continue to work with representatives of Zambia for the acquisition by Zambia of a 51% interest in the Zambian mining, smelting and refining operations of its subsidiaries in accordance with the announced policy of Zambia to acquire such an interest. The Board believes that the results of such a course would be substantially less in the interests of shareholders than the present proposal."

We find this statement to be materially false and misleading and that it would have a bearing on a prudent man's voting for or against the proposals presented. Although shareholder approval of the nationalization was a term of the Agreement between Zambia and RST (DX–1, p. 2, § 3(A) ii), this in no sense meant that RST shareholders could have effectively prevented the 51% nationalization by voting against it, for even had the RST shareholders not "approved" the nationalization, Zambia would have "acquired" the 51% of RST's operating assets notwithstanding. (N.T. F.H. 534–35). Consequently, the only effective purpose for the vote was to decide whether shareholders approved the amalgamation with AMAX.

105. The following statement appears on page 4 of the Explanatory Statement (PX–42):

"Accordingly, this distribution will enable such RST shareholders to the maximum extent permitted to continue an interest in the Zambian mining operations directly and subject to generally the same tax laws and treaty considerations as pertain to their present RST shares (See Appendix M) while receiving the other assets being distributed to them free of Zambian exchange control restrictions; and to the extent RST shareholders obtain Amax common stock by exercising the Amax Warrants being distributed, they will secure through Amax an interest in such portion of RCM as Amax may then own."

We find this statement, which is material and would have a bearing on a prudent man's voting for or against the proposals presented, to be misleading. The language "to the maximum extent permitted" could be interpreted by a stockholder, particularly in light of the failure of the explanatory materials to disclose any alternatives other than amalgamation with AMAX open to RST, to mean that the package proposed to be distributed by AMAX gave them the maximum participation in Zambian mining operations allowable by the agreement with the Zambian Government. This was materially misleading because if there were no amalgamation with AMAX the stockholders of RST would have been entitled to their pro rata interest in all of the assets acquired by AMAX, including the disproportionate interest in RCM, the management and sales contract, the Ametalco group and their interest in the miscellaneous assets.

## II. OPINION

The issues in this case are:

(1) whether the High Court of Zambia's confirmation of RST's Reduction of Capital on August 14, 1970 bars plaintiffs' claims asserted in Counts I, II, III and V of the Amended and Supplemental Complaint;

(2) whether the amalgamation of AMAX and RST is fair and equitable to all RST shareholders;

(3) whether the Explanatory Statement and its Appendices were false or

misleading in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5, promulgated thereunder;

(4) whether plaintiffs have standing to raise alleged violations of Sections 7 and 8 of the Clayton Act and, if so, whether they have proved such violations;

(5) if plaintiffs are entitled to relief on one or more of the grounds, to what relief are they entitled?

## (1) THE EFFECT OF THE HIGH COURT OF ZAMBIA'S ORDER

Defendants have strongly urged upon us the argument that the order of the High Court of Zambia approving RST's Reduction of Capital is a valid final judgment and, as such, should be recognized and given effect as a conclusive determination of plaintiffs' claims concerning the fairness of the amalgamation and the alleged violations of the Securities Exchange Act of 1934. *See* Goodrich & Scoles, Conflict of Laws 390 (4th ed. 1964); Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895).

On August 14, 1970, the High Court of Zambia found the amalgamation fair to all RST shareholders when it approved the Reduction of Capital. (*See* Finding of Fact No. 52, *supra* and Finding of Fact No. 35 of our Findings of Fact of June 8, 1970). Implicit in this finding of fairness, defendants argue, is a finding that the explanatory materials fully and adequately disclose all material information to the shareholders. Accordingly, plaintiffs are said to be barred before this Court.[7a]

We cannot agree that this Court is foreclosed from inquiring into the fairness of the amalgamation and the alleged Securities Exchange Act violations by the High Court's August 4th Order for the following reasons:

■ (1) United States Courts have exclusive jurisdiction under the Securities Exchange Act and defendants have not asserted that any similar law exists in Zambia. Accordingly, no finding, especially one that is merely implicit in the High Court's finding of fairness, could bind this Court, at least as to plaintiffs' Securities Exchange Act claims;

■ (2) The jurisdiction of this Court was invoked first and this Court, prior to the High Court's ruling, by our Order of August 12, preliminarily enjoined the amalgamation, except to allow defendants to seek approval in the High Court of the acquisition by Zambia of 51% of RST. We found that plaintiffs had demonstrated a strong probability that they would succeed in proving the unfairness of the amalgamation and violations of the Securities Exchange Act of 1934. Hence, as we see it, the burden then shifted to the High Court of Zambia to give recognition to our findings, especially those concerning the Securities Exchange Act.[8] It did not. Under these circumstances, having already made preliminary findings that plaintiffs were entitled to relief, we do not think that a *subsequent* ruling of the High Court of Zambia can prevent us, after further extensive hearings, from making our findings final.

■ (3) The proceedings before the High Court of Zambia, though on notice, were not in fact adversary and the High Court's Order does not indicate any consideration of the grave questions of conflict of interest and valuation discussed in this opinion, *infra*.

---

**7a.** See also the affidavit of David Ffinlo Quirk, an attorney in Zambia, filed September 24, 1970.

**8.** Defendants inform us that the entire record in this case, including apparently our Order of August 12th, was before the High Court before it ruled.

Also, the fact that the Court of Appeals stayed the effect of our preliminary injunction would not cast doubt on our August 12th findings because the Court did not rule at that time on the merits of our findings. Hence, as of August 14, when the High Court ruled, our findings stood undisturbed.

## (2) THE FAIRNESS OF THE AMAL-GAMATION

█ The question of the fairness of the amalgamation raises, under conflict of laws principles, a question under the law of Zambia. Under Zambian law, as in the United States, corporate directors owe a fiduciary duty to the corporation.[9] Similarly, a controlling shareholder owes a fiduciary duty to the non-controlling shareholders.[10] However, under Zambian and prevailing United States law the existence of a fiduciary duty does not prevent a fiduciary from dealing in transactions in which he has an interest adverse to the object of his fiduciary duty as long as, in final analysis, the transaction can be said to be fair. That is, only if the transaction is found to be unfair can a fiduciary be held to have breached his fiduciary duty. (See authorities cited in Defendants' Brief, pp. 7–12). Accordingly, it is defendants' position that the directors of RST who were interested on behalf of AMAX in the amalgamation nevertheless acted properly because the amalgamation was fair to all RST shareholders.

Some courts have, however, taken exception to this "prevailing" view. In Seagrave Corp. v. Mount, 212 F.2d 389 (6th Cir. 1954) the Court held that a corporate fiduciary who placed himself in a position of conflict between his fiduciary obligation and his own private interests is guilty of constructive fraud, even if this "interested" fiduciary acted in good faith and the transaction was fair. In Seagrave, such constructive fraud was found to be sufficient to allow minority stockholders to enjoin a proposed purchase of another corporation.

█ We believe that this case is a middle ground between Seagrave and the so-called prevailing view. Here, where the conflict of interest is so grave and the benefits to one party so great we think that the transaction may be considered, in the circumstances under which it was negotiated, inherently unfair.

Although it seems clear that Sir Ronald Prain did his best to negotiate a fair deal with AMAX, he was bargaining from a position of weakness in a situation which was inherently coercive to him and the public stockholders of RST. In terms of his own board, six were employees and/or directors of AMAX. Vuillequez, the chief negotiator for RST, was a life-long employee of AMAX having started to work for the company at the age of 16 and having become ultimately a director and member of the executive committee on the board of AMAX in 1956. He came to RST in 1964 when the Ametalco group was sold to RST. Vuillequez knew as early as December 1969 that MacGregor and Donahue were determined to have AMAX acquire RST after the nationalization. He thus knew that the overwhelming probabilities were that he would become an employee of AMAX once again. Further, he owned approximately 1 million dollars worth of AMAX stock which was considerably greater than his holdings in RST, which then had an approximate market value of $80,000. In addition, the four RST directors who were also Selection directors must have known that Selection owned 11.8% of AMAX stock. It thus appears that the financial interest of at least nine of the thirteen directors of RST clearly lay in benefitting AMAX rather than the public stockholders or RST, because they were either AMAX or Selection directors. Further, Vuillequez was one of the remaining four directors who were not AMAX or Selection directors and his interests clearly lay with AMAX. Notwithstanding this, Sir Ronald Prain pursued a plan of internationalizing RST and externalizing its assets with the idea of becoming a United States or Luxembourg company and engaging in

---

9. See, e. g. Aberdeen Ry. v. Blarkie, (1854) 1 Macq.H.L. 461 (H.L.Sc.) L. C. B. Gower, Principles of Modern Company Law 526–27 (3d ed. 1969).

10. See e. g., Allen v. Gold Reefs of W. Africa (1900), 1 Ch. 656, 671; Cook v. Deeks (1916) 1 A.C. 554, P.C.; Gower, *supra* at 564–80.

international mining operations. The plan was not merely a dream since RST had previously engaged in exploratory activities in Jamaica, Australia and Chile and would have continued these had not the Zambian exchange control prevented them from doing this. Recognizing the potential economic conflict between an "internationalized" RST and AMAX, Prain offered to buy out AMAX's interest in Roan. MacGregor flatly rejected this idea. It seems clear that Sir Ronald pursued the plan of internationalization until February 26, 1970 when at a meeting in New York he was advised by United States tax counsel that although the reorganization based on internationalizing Roan would be tax free to AMAX, it would have resulted in ordinary income to the non-AMAX stockholders if it was coupled with a distribution of the Zimco bonds and a cash dividend. At this point the only viable alternative to Roan was to either have AMAX buy out the public stockholders or have Roan buy out AMAX. A further consideration with respect to internationalizing Roan was the advice received by Rothschild that an internationalized RST would have a borrowing capacity of probably not in excess of 35 million dollars. Since the average cost of putting a new copper mine into production has recently exceeded 200 million dollars, the limitation on its borrowing capacity seemed to be a real bar to Roan's going it alone in the mining field.

The directors of AMAX were able, then, to drive a hard bargain to wash out the public shareholders as cheaply as possible, while securing for AMAX unique high-yielding assets. It was inherently unfair and therefore a breach of fiduciary duty for the AMAX directors who were negotiating for AMAX and who were RST directors to fail to make good faith efforts to share with the public shareholders of RST their fair share of the unique benefits flowing to AMAX as a result of the amalgamation. MacGregor refused even to discuss a straight equity participation by Roan shareholders in AMAX. Rather, once MacGregor made the decision to acquire RST he was determined to bull it through the stockholders by whatever means was necessary including the coupling of the vote on nationalization with that on amalgamation and writing the explanatory statement in such a way as to make it appear that the public stockholders really had no other alternative.

In piecing together the many bits of evidence throwing light on this question, it seems quite apparent that the real reason that the Roan directors backed themselves into an impossible corner was because MacGregor and the other AMAX related directors would not accept a plan of internationalizing Roan without AMAX being able to either change its position from minority stockholder to majority stockholder or getting out of Roan entirely. MacGregor and Prain and their advisers all felt that since an internationalized Roan would probably be in direct competition with AMAX in international mining ventures, AMAX's position as a 42% stockholder in such a venture would be embarrassing if not clearly illegal under the American Anti-Trust laws. It also seems clear that MacGregor very early in the game decided that it was to the benefit of AMAX to be a buyer rather than a seller. Thus it developed that for the ostensible purpose of "externalizing" the assets of Roan for the benefit of the public stockholders the remaining high yielding assets were transferred to AMAX in return for its subordinated debentures. From Prain's initial determination that the Zimco bonds plus some cash should be distributed to the stockholders and from MacGregor's refusal either to be a part of internationalized Roan or to sell the AMAX interest in Roan all else followed.

In the Court's view, this is a classic case where a dominant minority stockholder was in fact in a controlling position and simply could not deal fairly with the unrepresented majority stockholders no matter how many prestigious outside advisers were brought in to as-

sist in the negotiations.[11] The one thing that the majority stockholders were never asked is whether they would prefer to continue as stockholders of an internationalized Roan rather than as debenture holders of AMAX. There simply did not exist in the entire negotiating structure a single person who could speak exclusively on behalf of the majority stockholders and as a consequence this fundamental question was never put to the stockholders.

Indeed, it even appears that the negotiations with the Zambian Government were conducted in such a way as to make it impossible to submit any alternative plan of externalization at the meeting called to pass upon the nationalization. In this connection it should be noted that the record never clearly gave a satisfactory answer as to why the stockholders were asked to vote on nationalization. Sir Ronald Prain's uncontradicted testimony was that no stockholders' approval was necessary under Zambian law to effectuate the nationalization of 51% of Roan. Considering the negotiations in the light of MacGregor's determination to acquire Roan, it seems clear that the reason stockholders' approval was negotiated by Roan in the agreement with Zambia was to lay the groundwork for the assertion which later appeared in the Explanatory Statement that a vote against the planned amalgamation would require a re-negotiation of the deal with the government of Zambia, which might result in less favorable returns for the public stockholders. This, in turn, was used as the basis for coupling in a single vote the nationalization with the amalgamation.

From the record before this court, it is clear that the only fair method of presenting the question of nationalization and its consequences to the non-AMAX shareholders would have been, at the very least, to have presented them with a choice as between internationalization of Roan and amalgamation with AMAX. The reason this choice was never presented to the non-AMAX shareholders was because of AMAX's domination of Roan and its determination to acquire the remaining assets of Roan by whatever means necessary.

It may be observed in passing that even if the alternatives had been fairly presented in a statement which gave all the information necessary to make an intelligent choice, that this in itself might not have cured the vice inherent in this situation. This is true because even in such a case one of the alternatives, i. e., the amalgamation with AMAX, would have been negotiated with persons dominated by AMAX and therefore possibly not representing the best price that could be gotten from AMAX by persons whose only loyalty was to the non-AMAX shareholders. In any event, it is clear that what happened here cannot be allowed to stand since it was the domination and determination of AMAX to coerce the Roan board to negotiate exclusively on the subject of amalgamation and the evidence indicates, as will be explored *infra*, that the price negotiated was the lowest possible price that could be negotiated. The only truly fair deal would have been to allow the public shareholders to share in the unique benefits flowing to AMAX through some form of equity participation and it was precisely this that MacGregor firmly refused even to discuss.

As expressed by then Chief Justice Cardozo of the Court of Appeals of New York in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1:

"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not hon-

11. The fact that MacGregor could so flatly foreclose discussion on the RST proposal that RST buy out AMAX is a clear indication that AMAX dominated the negotiations and that RST was in a difficult bargaining position because of AMAX's domination. See also, PX–5, App., p. 10.

esty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions".

MacGregor and the other AMAX directors of Roan did not seem to realize that their conduct was governed by the standards of the above-quoted language in connection with their *independent* fiduciary duty to Roan. As MacGregor stated to the Court in our preliminary hearing "I have only one company, American Metal Climax". (N.T.P.H. 386).

 Further, even if this amalgamation were not considered inherently unfair, the evidence reveals that it is in fact unfair. The burden of proving fairness is on the fiduciary. Although defendants argued, on the basis of one early British case [12] and several United States decisions, that shareholder approval has shifted the burden, we have found that the burden of proving fairness rests on defendants notwithstanding such shareholder approval for the following reasons. First, there is authority that shareholder approval does not shift the burden of proof. See David J. Greene & Co. v. Dunhill International, 249 A.2d 427 (Del.Ch.1969). Secondly, and more importantly, shareholder approval in this case is vitiated because, as we have found (Findings of Fact Nos. 97–105), and will discuss below, the explanatory materials violated the Exchange Act of 1934. In this situation, the shareholders cannot be said to have made an informed decision. Accordingly, defendants' heavy burden does not shift.

 Before turning to an analysis of fairness, we believe that it is necessary to first inquire into the nature and degree of the fiduciaries' self-interest in this case because such an inquiry is relevant in judging fairness. The more interested a fiduciary is, the greater the burden upon him to show that he has not breached his fiduciary duty. With this in mind, we turn to an analysis of the nature of the interests of the fiduciaries involved.

 The first question in this regard is whether AMAX controls RST. If it does, then there are two fiduciary relationships involved in this case, namely the duty owed by the directors of RST to RST and the duty owed by a controlling shareholder to the non-controlling shareholders.

 We have found that AMAX controls RST and we have done so for two reasons. First, AMAX owned 42.3% of RST and this in itself constituted practical or working control of RST. A shareholder need not own 51% of a company in order to control it. SEC v. R. A. Holman & Co., 377 F.2d 665 (2nd Cir. 1967); Essex Universal Corp. v. Yates, 305 F.2d 572 (2d Cir. 1962); Perlman v. Feldmann, 219 F.2d 173 (2nd Cir. 1955); Insuranshares Corp. v. Northern Fiscal Corp., 35 F.Supp. 22 (E.D.Pa.1940). Secondly, 10 of 13 RST directors were AMAX controlled or interested because they were either also directors of AMAX or Selection, or were past employees of AMAX. (See Findings of Fact Nos. 53–71). Under these circumstances we have concluded that AMAX controlled the Board of Directors and this, coupled with its 42.3% stock ownership, constituted control of RST. Hence AMAX, the controlling shareholder, owes a fiduciary duty to the non-AMAX shareholders of RST.

The second fiduciary obligation involved is the one owed to RST by the individual RST directors. The nature and extent of this interest is as follows. The 6 RST directors who are also AMAX directors own substantial holdings in AMAX and 3 of these men actually negotiated the amalgamation with RST on behalf of AMAX—MacGregor, Donahue and Harold Hochschild. Harold

---

12. Shuttleworth v. Cox Bros. & Co. (1927) 2 K.B. 9, 18, C.A.

Hochschild is one of the largest individual shareholders in AMAX, if not the largest, Donahue is President of AMAX and MacGregor is Chairman of the AMAX board and its Chief Executive Officer. One of the 6—Wharton-Tigar—is also a Selection director and owns Selection stock. (Selection, owns 11.8% of AMAX. See Finding of Fact No. 54). Of the RST directors who are not also AMAX directors, 3 are also Selection directors and own Selection stock. Prain, RST Chairman, is one of these Selection directors and owners. Vuillequez, one of the negotiators on behalf of RST, has a long history of AMAX connection, and was for 7 years an AMAX Director. As indicated earlier, he owns 26,169 AMAX shares, worth approximately $1 million. Further, Rothschild & Sons, who were hired by RST to advise it in its negotiations with AMAX, owned 126,000 shares of Charter. (Charter owns 27% of Selection. See Finding of Fact No. 55). The extent of these fiduciaries' interest, then, is extremely great. (See, generally, Findings of Fact Nos. 53–71). They are interested for AMAX because of their corporate relationship to AMAX and/or Selection and they are interested for themselves because of their extensive personal holdings in AMAX and/or Selection. This by itself, not to mention AMAX's control position in RST, imposes in our view a very high degree of fiduciary duty and, therefore, a very heavy burden of proof. The fairness of the amalgamation can only be viewed against the background of this extensive self-interest on behalf of AMAX and certain RST directors.

The question whether this transaction was fair hinges on whether the AMAX debentures, valued at $76.2 million, was fair value for the RST assets, valued at $75.2 million, which AMAX acquired from the non-AMAX stockholders. In resolving this question, as we have noted, the burden of proof is on the defendants.

We have concluded that defendants have failed to meet their burden. Plaintiffs have come forward with evidence that the value paid by AMAX was unfair in two regards. First, we have found that the AMAX debentures were overvalued by RST's investment advisers. (See Finding of Fact No. 75). It is clear that the advisers were unsure of how to value the debentures and guessed their value to be between $98 and $100. There is also evidence that the day before the amalgamation was finalized, the debentures were valued at $93 by the advisers. (See Finding of Fact No. 76). Nevertheless, the RST advisers ascribed to the AMAX debentures the highest value. In this connection it is important to note that for every $1 less than $100 the debentures were valued, the value of the debentures on the whole decreased by over $750,000. It is up to defendants then to justify ascribing the higher value to the debentures and we have not been persuaded on the evidence that the higher value has been justified.

Secondly, plaintiffs have come forward with evidence that RST's advisers did not fairly value the RST assets acquired by AMAX. (Finding of Fact No. 80). Generally, in viewing the evidence as a whole, it appears that each of the RST assets was ascribed a range of values during the period of negotiations and, almost in every case, by March 5, 1970, the finally negotiated value was the lowest value.

There is clear evidence that the $20 million valuation ascribed to the so-called miscellaneous assets, including Fiji and Baluba, was too low. On January 9 and 10, these same assets were valued at $33 to $50 million by Rothschild. Two particular components of these miscellaneous assets in question here, the Fiji exploration and the Baluba orebody, were clearly undervalued. The advisers valued these assets by the amounts actually expended by RST on these projects up to December 31, 1969. With respect to Fiji, this was $600,000. However, further expenditures for this project for 1970 of $350,000 were authorized and $165,000 was authorized to finance the purchase of additional areas in Fiji. If Fiji is to

be valued by a measure such as actual expenses up to December 31, 1969, there is no reason why these additional authorized expenditures should not also be included in valuing it. Also, the measure of "actual expenses" placed no value on Fiji's potential as a valuable source of minerals. It was reported to RST, in a preliminary survey, that Fiji did appear to contain valuable resources sufficient to justify further exploration. In the explanatory materials, RST admits Fiji's value could be very high. On January 9–10, Prain, on the basis of the above preliminary study, valued Fiji at $25 million and at this same time Rothschild valued it at $15–$20 million. These facts lead us to conclude that Fiji was undervalued. Its value should have included the further authorized expenses and some amount for what appears to be a bright future. (As to Fiji, see Findings of Fact Nos. 83–84).

As to Baluba, this orebody was valued by the advisers at $4 million, again using the measure of actual expenses up to December 31, 1969. However, during the first quarter of 1970 an additional $2.16 million was actually expended in Baluba. In addition, on January 9–11, RST valued Baluba as high as $8 million and at that time Rothschild and AMAX tentatively agreed that Baluba was worth $6 million. Moreover, it appears that the Baluba operations will be made profitable by 1974. (See PX–43, I–I and Finding of Fact No. 88). As compared to AMAX's Puerto Rican venture, Baluba appears to be a more valuable undertaking (See Findings of Fact Nos. 88–89). These facts lead us to conclude that Baluba was undervalued by at least $2 million. (As to Baluba, see Findings of Fact Nos. 84–88).

Also, the evaluation of Fiji and Baluba by the RST advisers are subject to serious question because the advisers assumed the accuracy of all information and statements in the explanatory materials and made no independent survey or appraisal of RST's mining operations, mineral reserves and exploration rights. (See Finding of Fact No. 81). In light of the extensive conflict of interest in AMAX and RST directors in this case, and since *the* most important aspect for valuing a mining company such as RST is its mining properties, mineral reserves and exploration rights, of which these miscellaneous assets were comprised, and since the advisers have valued Fiji and Baluba at such widely disparate values, the advisers to RST should have made an independent analysis and should not have relied on RST so extensively.

In conclusion, then, plaintiff has shown us clear evidence that the so-called miscellaneous assets, especially Fiji and Baluba, were valued too low and defendants have failed on the evidence to offset this clear evidence.

Second, with reference to the other RST assets, the plaintiffs' evidence raises serious question in our mind whether the evaluations finally ascribed to each was fair and defendants have not persuaded us to the contrary. Hence, we cannot conclude that the valuations were fair.

### (A) RCM

With reference to the valuation of the public's share of RCM acquired by AMAX, the evidence shows that it was valued on January 10, 1970 by Rothschild at $126 to $202 million. (Finding of Fact No. 89). However, on March 5, 1970, AMAX's share of RCM was finally given the value of $120 million. (Findings of Fact Nos. 72, 88). The conflict in valuations arises from a conflict in the price earnings multiple to be assigned to RCM and defendants have not persuaded us that the lower multiple is the fair one.

### (B) MANAGEMENT CONTRACT

This was finally valued by the advisers at $12.5 million or five times the estimated annual earnings of $2.5 million. On this basis the 57.7% interest to be acquired by AMAX was valued at $7.2 million. (Finding of Fact No. 91). However, since the management contract was for a minimum duration of 10 years,

it would appear to be just as reasonable to value this asset at ten times earnings and defendants have not persuaded us that the basis of five times earnings is a fair one. In fact, in late January, AMAX valued its 57.7% interest in the management contract at $9 million and Rothschild evaluated it at $11.6 million. (See Finding of Fact No. 91).

### (C) AMETALCO

On the basis of Findings of Fact Nos. 92–94 we have a serious question whether Ametalco was fairly valued. Ametalco was valued at $13 million as a whole and AMAX's acquisition of 57.7% was therefore assigned a value of $7.5 million. The basis of this evaluation was five times estimated annual earnings. However, AMAX, both before and after Zambia's decision to nationalize 51% of RST, valued RSTIM, 90% of whose earnings consists of Ametalco's earnings, at a price earnings multiple of 8 to 10 times average earnings of $2.9 million. On January 10, 1970, Rothschild valued RSTIM between 7 and 10 times $2.3 million. Again, defendants have not persuaded us that the value finally ascribed to Ametalco was fair in light of these very high evaluations of RSTIM.

Cutting through to the essence of the evaluation of RST's assets, it is clear that the assets were valued within a range of values from about $490 million to $303 million and that in each case the final value was in the lower part of the range, if not the lowest. (Finding of Fact No. 95). In almost every case, the defendants have failed to persuade us that these finally negotiated values were fair.

Concluding, then, we believe that the underevaluation of Fiji and Baluba by itself and especially when coupled with the overevaluation of the AMAX debentures, and the failure of defendants to persuade us as to the evaluations of certain other RST assets renders the amalgamation unfair to the non-AMAX RST stockholders in view of defendants' heavy burden of proof in this regard.

Also, we believe the evidence is so strong that even if the plaintiffs had the burden of persuasion in this case, we would find that the evidence sustains that burden.

### (3) VIOLATIONS OF THE SECURITIES EXCHANGE ACT.

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j, provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5, promulgated under Section 10(b) provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange

"(a) to employ any device, scheme or artifice to defraud,

"(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

It is now axiomatic, and not contested by the defendants, that an exchange of

stock in a merger or similar context, here the amalgamation of RST and AMAX, falls within the protective ambit of Section 10(b) and Rule 10b–5; SEC v. National Securities, Inc., 393 U.S. 453, 467–469, 89 S.Ct. 564, 21 L.Ed. 2d 668 (1969); Swanson v. American Consumer Industries, Inc., 415 F.2d 1326, 1330 (7th Cir. 1969); Mader v. Armel, 402 F.2d 158, 160–161 (6th Cir. 1968); Dasho v. Susquehanna Corp., 380 F.2d 262, 267–269 (7th Cir. 1967), cert. denied, Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967); Vine v. Beneficial Finance Co., 374 F.2d 627, 634–635 (2d Cir. 1967), cert. denied 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967).

■ Measuring the Explanatory Statement and Appendices by Section 10(b) and Rule 10(b)–5, we find that it is fatally defective in that it contains material omissions of fact necessary to be stated to make the statements made not misleading, and in many cases fails to fully, fairly and adequately disclose material facts.

The Explanatory Statement was materially misleading in that it was designed to persuade the shareholders that the amalgamation with AMAX was an inevitable consequence of the nationalization of RST. The purpose of this was to prevent the stockholders from making an informed judgment as to whether they should amalgamate with AMAX or externalize RST on some other basis. Since this was the pivotal decision for the future of the company, the failure to disclose to the stockholders that they had this choice was a material and fatal omission in the Explanatory Statement under federal securities laws.

It is clear that under the terms of the Agreement with the Zambian Government (DX–1), RST had the discretion to transfer its assets to a non-Zambian holding company or to hold its assets. (DX–1, p. 5). It is further clear that there is no time limit in the Agreement with Zambia with respect to when the externalization of the non-Zambian as-

sets must be accomplished. The relevant language of the Agreement is as follows:

"At the *discretion* of RST the transfer of all or part of the assets of RST (which shall include its 'B' shares of OPCO [RCM]) to a new international non-Zambian holding company (hereafter called 'NEWCO') in exchange for shares in such holding company to be issued to the RST shareholders or as may otherwise be decided, all of such assets to be free of any Zambian exchange or other controls. At the *discretion* of RST, all or part of such transfers may be made to shareholders of RST rather than to NEWCO * * *" (DX–1, p. 5) (emphasis supplied)

Under Zambian law, stockholders' approval was not necessary to accomplish the Zambian Government's nationalization of 51% of the operating assets of RST. The record also shows that as late as March 4, 1970, the RST Board was still considering a plan to externalize its assets by becoming an international company as an alternative to the amalgamation with AMAX. (See Finding of Fact No. 41(a)). Nor is there any dispute that if RST had pursued this plan all of the requirements of the Zambian Government would have been satisfied.

In the light of these facts, the Explanatory Statement was materially misleading. The Explanatory Statement begins by suggesting that approval by the shareholders was necessary to accomplish the nationalization. Thus, on page 1 of the Explanatory Statement (PX–42), the following language appears:

"This Explanatory Statement describes the proposal of the RST Board that the shareholders of RST approve this sale to Zimco *as part* of their approval of a reorganization of the structure of the RST Group * * *" (emphasis supplied).

This language clearly suggests that the stockholders' approval was necessary for the sale to Zimco. On page 2, after describing the arrangement with the

Zambian Government, the following language appears:

"At an early stage of this consideration, AMAX raised with RST the possibility of an amalgamation of part of the RST Group into AMAX, with a distribution of other RST assets and AMAX securities to the other RST shareholders, as a means of effecting a reorganization to meet the foregoing considerations * * *."

In the context in which it appears, this sentence suggests that the amalgamation with AMAX was proposed as a means of effecting a reorganization meeting the requirements of the Zambian Government.

The linkage between the Zambian Government proposal and the amalgamation in the mind of the reader is further reinforced by the following language appearing on page 2:

"Approval is being sought from RST shareholders of the foregoing proposal as a whole. Under the law of Zambia, this proposal, since it involves a reduction of capital of RST, cannot become effective unless confirmed by the High Court for Zambia after it has been approved by the shareholders of RST by a special resolution * * *"

The concept that the present proposal was required by the Agreement with the Zambian Government and gave the stockholders the maximim interest that they would be permitted by the Zambian Government to continue to have in the Zambian mining operations was further suggested in the language appearing on page 4:

"Accordingly, this distribution will enable such RST shareholders to the maximum extent permitted to continue an interest in the Zambian mining operations directly and subject to generally the same tax laws and treaty considerations as pertain to their present RST shares (See Appendix M) while receiving the other assets being distributed to them free of Zambian

exchange control restrictions; and to the extent RST shareholders obtain Amax common stock by exercising the Amax Warrants being distributed, they will secure through Amax an interest in such portion of RCM as Amax may then own." [12a]

The inter-dependency of the transaction is further reinforced by the language appearing on page 5:

"The Board believes that it has a duty to point out to shareholders that, if the Resolutions are not approved by the shareholders, the Board of RST must continue to work with representatives of Zambia for the acquisition by Zambia of 51% interest in the Zambian mining, smelting and refining operations of its subsidiaries in accordance with the announced policy of Zambia to acquire such an interest. The Board believes that the results of such a course would be substantially less in the interests of shareholders than the present proposal." [12b]

The above-quoted statements are materially misleading because their calculated and designed effect was to persuade the stockholders that the amalgamation with AMAX was an inevitable consequence of the nationalization of RST and was the only possible way of complying with the Agreement between Zambia and RST and at the same time maintain for the non-AMAX stockholders their maximum allowable interests in the Zambian mines. The true facts, which were known to all of the members of the RST Board, were that the Agreement with the Zambian Government was completely independent of the Agreement with AMAX and did not require stockholders' approval; that the provision for externalization did not require immediate externalization and required no Agreement with AMAX; that the RST Board of Directors had approved a plan for externalization under the terms of which RST would become an international mining company and would re-

---

12a. See Finding of Fact No. 105, *supra.* 12b. See Finding of Fact No. 104, *supra.*

main independent of AMAX; and that the defeat of the single proposal could not change the terms of nationalization, but would only require a new plan for externalization and that such a plan was available.

To a sophisticated investor, having an encyclopedic knowledge of everything contained in the Explanatory Statement and Appendices, each of the above statements might be understood to be literally true. But not even the most sophisticated investor would be likely to glean from these materials that nationalization did not in any real sense require stockholder approval, and that the effect of defeating the Resolution would not be to prevent nationalization or substantially alter its terms. Further, not even the most sophisticated investor could, through reading the materials sent to stockholders, understand the true basis for the RST directors' decision to amalgamate with AMAX as opposed to other alternatives. Finally, even if it be argued that each of the above statements were literally true, literal truth is not a defense where the general effect of the explanatory materials is to mislead.

In addition to making statements calculated to lead the stockholders to believe that the amalgamation with AMAX was the inevitable result of the nationalization, the defendants designed the instruction form (PX–44) to the shareholders in such a way that a shareholder was required either to vote for or against both nationalization and amalgamation in a single vote. This made it physically impossible for a stockholder to vote in favor of nationalization and against amalgamation. When this question was first presented to the Court at a preliminary hearing, the Court declined preliminary relief on the ground that the manner in which the issues were to be presented to the stockholders was a question of business judgment for which the Court would not substitute its own judgment. After having heard all of the testimony and reviewed all the exhibits, the Court has concluded, however, that the manner of presenting the proposals to the stockholders was itself a manipulative and deceptive device designed to reinforce the concept that nationalization and amalgamation were inextricably intertwined and to coerce the stockholder who felt that he had no choice as to nationalization to vote in favor of the amalgamation.

Further, even if the joining of the amalgamation and nationalization proposals into one resolution were not considered to be a manipulative scheme, the failure of the Explanatory Statement to set forth the reasons for such a presentation is a material omission. For example, a shareholder who wanted to vote in favor of one and against the other would want to evaluate the reasons for joining the two proposals. If he thought the reasons were valid and justified, he might vote in favor of both proposals, and vice versa. It is interesting to note that the defendants, at trial, went to great lengths to convince the Court that the joining of the two proposals into one resolution was founded on sound judgment (See N.T.F.H. 591–93, 769–71, 1367–70), but no such explanation was provided the RST shareholders.

In addition to the foregoing materially misleading statements and omissions, the Explanatory Statement fails to explain to the stockholders the course of the negotiations between AMAX and RST and the basis of evaluation of the assets which AMAX acquired from RST. In this connection, it is most significant to note that during the course of the negotiations, as to every asset which had a range of values assigned to it by either AMAX, RST or their advisers, at the conclusion of the negotiations, the value accepted as a basis for the transaction was invariably on the lower range. (See Finding of Fact No. 95, *supra*). A clear presentation of the values assigned the RST assets (such as DX–43, II, which the defendants prepared for purposes of litigation) and the basis upon which the evaluations were made were crucial to an informed shareholder vote,

and the omission of these facts from the explanatory materials was material.

In addition to the above, the Court has found the following violations of the Securities Exchange Act.

## A. OMITTED FACTS

### (1) IDENTITY OF RST DIRECTORS WHO NEGOTIATED WITH AMAX.

In view of the extensive conflict of interest on the part of RST directors it would be very important for the shareholders to know who negotiated with AMAX for RST. Vuillequez and Prain's extensive connection with AMAX and/or Selection makes it essential that the shareholders know not only the nature of those connections but also that these were the very men who represented them in RST's negotiations with AMAX. The failure to include this must be considered a material omission.

### (2) THE INVOLVEMENT OF SULLIVAN & CROMWELL

Sullivan & Cromwell represented both AMAX and RST for 35 years, advised RST in its negotiations with the Zambian Government and continued to represent both AMAX and RST even after the amalgamation was proposed. (Findings of Fact Nos. 19, 71). Sullivan & Cromwell thus placed itself in a clear position of conflict of interest. Though this position is sought to be justified because the RST directors agreed to allow Sullivan & Cromwell to continue to represent it notwithstanding the conflict, such agreement is meaningless in view of AMAX's control of RST and the RST Board. Nevertheless, even assuming that Sullivan & Cromwell could continue to represent both, their position is a material fact which should have been disclosed to the shareholders. It would be important for shareholders, in evaluating the advice of RST directors to vote in favor of the amalgamation, to know that through December, 1969 RST was being advised by lawyers who were also advising AMAX.

## B. "BURIED" FACTS

The Securities Exchange Act requires more than disclosure, it requires adequate disclosure. The more material the facts, the more they should be brought to the attention of the public. To view it otherwise would be to invite frustration of the policies underlying our disclosure laws. Accordingly, we have found certain facts to be "buried" in the explanatory materials. These facts should have in some way been highlighted to insure that the shareholders were aware of them. We need not speculate as to how this should have been done. One obvious way does, however, come to mind, namely, these facts could have been placed on the cover page in bold-face type. Nevertheless, their present location is not justified by their importance, especially in view of the length and complexity of the explanatory materials.

### (1) THE BENEFITS TO AMAX

This is an especially crucial fact in view of the conflict of interest which existed between RST and AMAX on the part of certain RST directors. There are references to these benefits in the explanatory materials (see defendants' brief, p. 46) and the letter from plaintiff Kohn to the shareholders included with the explanatory materials also refers to these benefits. (Court Exhibit No. 2). In our view, these references do not adequately highlight the benefits and Kohn's letter would not overcome this deficiency because of the context in which it was sent, i. e., a statement from a dissident shareholder who is attempting to enjoin AMAX from amalgamating with RST. It is defendant RST's responsibility to disclose adequately all facts and disclosure by RST would likely have greater weight in the mind of a shareholder than a disclosure by a dissident shareholder.

### (2) THE INVESTMENT ADVISERS' FAILURE TO MAKE AN INDEPENDENT ANALYSIS

As we have noted above in the section on fairness, it is important in evaluating

Baluba and Fiji to realize that no independent survey of these areas were conducted by RST's investment advisers. This fact was disclosed at pages Q–1 and Q–2 of the Appendices to the Explanatory Statement. It is important to note that pages Q–1 and Q–2 are approximately pages 175 and 176 of 200 pages of materials. It is also important to note that on page 2 of the Explanatory Statement, in bold-face type, there appears the investment advisers' opinion that the transaction was fair. At that point the stockholders are only referred generally to Appendix Q where there is a copy of the advisers' opinion. This does not sufficiently highlight this fact. As we have pointed out, *supra,* the evaluation of the RST assets, especially Fiji and Baluba, was crucial in this case. The RST assets were assigned such widely disparate values and were finally valued so low within that range that the shareholders had a right to know the basis upon which the investment advisers made their evaluations.

(3) THE CONFLICT OF INTERESTS OF THE RST DIRECTORS, ADVISING BANKERS AND OTHERS

These facts are disclosed in the Explanatory Statement and Appendices but are insufficiently disclosed. These facts are so important that they should have been highlighted, even if only by a statement on the cover of the explanatory materials that a majority of RST directors have a conflict of interest in the transaction, because of their connection with AMAX or Selection.

(4) THE IDENTITY OF THE AMAX NEGOTIATING TEAM

Important in connection with knowing the extent of the conflict of interest among certain RST directors is knowing their role in the negotiations with AMAX. The fact that certain RST directors negotiated for AMAX was disclosed only in our June 8 Opinion which was made an Appendix to the Explana-

tory Statement and such a disclosure is insufficient.

In conclusion, for the foregoing reasons, we hold that the Explanatory Statement and Appendices are violative of Section 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder because it fails to disclose all material facts adequately, contains material misrepresentations of fact and omits to state facts necessary to be stated to make the statements made not misleading.

(4) DO PLAINTIFFS HAVE STANDING TO RAISE ALLEGED VIOLATIONS OF THE ANTITRUST LAWS AND, IF SO, HAVE PLAINTIFFS PROVED SUCH VIOLATIONS?

While we have serious reservations whether plaintiffs have shown any "injury" within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15, sufficient to confer standing upon them to raise the alleged antitrust violations, we do not believe, on the basis of the record before us, that such violations have been proved.

Plaintiffs rely heavily on expert testimony in order to show that the amalgamation of AMAX and RST and the alleged interlocking of directorates violate sections 7 and 8 of the Clayton Act, respectively. The expert testified that competition would be adversely affected by AMAX's acquisition of RST. However, he gave no consideration to the fact that AMAX already owned 42.3% of RST and that its net holdings after RST's nationalization would in fact be reduced. Rather, he testified on the basis of a hypothetical situation, treating AMAX as owning no part of RST. Although plaintiffs' attempt to overcome this defect by arguing that AMAX's acquisition of Ametalco and its ownership through RST International of the managing contract will in particular have a tendency to substantially lessen competition, this conclusion is not supported by this record. Thus, we have decided that plaintiffs have failed to sustain their

burden of proving any lessening of competition.

### (5) REMEDY

The most troublesome problem the Court has had with this case is the question of remedy. If the effect of the preliminary injunction earlier issued had not been stayed it would have been a relatively simple matter to enter a final order permanently enjoining the amalgamation on the basis disclosed in the explanatory statement. This remedy does not seem feasible now since the effect of the order of the High Court of Zambia has been to cancel all of the shares of RST held by stockholders other than AMAX. This court, of course, has no jurisdiction over the High Court of Zambia and even though it could enter an order requiring AMAX to petition the High Court of Zambia to enter an order reversing its previous order, there is no assurance that the court would do so. Further, the remedy of total rescission at this time may not be appropriate since events occurring after the amalgamation have adversely affected RST. First, the world copper price has declined from approximately 79 cents on March 5, 1970 to approximately 49 cents in late October. This, of course, will have a direct impact on RCM's future earnings and will also adversely affect the earnings of RST, International, since its profits are derived from RCM and from the management contract and the Ametalco group, all of whose earnings are related to the copper price. Further, since the amalgamation, the Mufilira mine which accounted for about half of RST's production and about 60% of its profits was flooded on September 25, 1970 and its production has been completely shut down.[13] Because of this RCM passed its second quarter dividend. These two factors make it clear that the value of an RST share today must be less than it was on March 5, 1970 before the decline of the world copper price and the mine disaster. Hence, an order requiring complete rescission might simply result in these losses, arising from superseding events, being shifted from the wrongdoers to the wronged.

The Court has also given serious consideration to awarding money damages to the plaintiffs. The very factors that led the court to conclude that the defendants had not carried their burden of proving the fairness of this transaction makes the court conclude that it would be difficult, if not impossible on the present record, to determine a precise dollar figure for the value of RST as of March 5, 1970. In this connection, it should be pointed out that the ten million dollars now being held as security for injury to the plaintiffs (which represents the approximate evaluation of AMAX's disproportionate $4\frac{1}{2}\%$ interest in RCM) might not be sufficient if in fact Baluba and Fiji are worth many times more than their book value on March 5th and if the proper earning multiple for RCM, Ametalco and the management contract should be significantly greater than 5.[14]

Under all the circumstances, the court has concluded that the only appropriate remedy is to enter an order requiring AMAX to tender to the former shareholders of RST shares of stock in RST International, Inc., representing their pro rata holdings in RST before the amalgamation. In effect, the order will require AMAX to make a public offering to the former shareholders of RST of 57.7% of RST International. Such an offering probably will have to be accompanied by a registration statement with

13. The market has reacted to the Mufulira disaster by discounting the price of RCM's stock by almost 50% since September 24, 1970. The day before the Mufulira disaster RCM was trading at approximately 6.60 a share, which is the highest price it has ever reached. On October 24, 1970, a month after the Mufulira disaster, RCM was trading at about 3.54 a share.

14. It may be that the Court will require, should it eventually be required to assess damages, the assistance of an independent evaluation of RST's assets, especially of Fiji and Baluba.

the Securities and Exchange Commission and in any event will be required by this court to be accompanied by an explanatory statement which fully and fairly discloses all the relevant considerations to the stockholders. It will also require AMAX to use its best efforts to cause a public market to be made in the securities of RST International so that the liquidity of the former stockholders of RST will not be adversely effected by their acceptance of the tender. The terms of the tender of course will require the stockholders to tender to AMAX the package including the cash, the Zimco bonds, etc., in return for their shares in RST International.

Such an order has the virtue at least of giving the public stockholders who owned the majority of this company the right to make the choice which should have been given to them when they were asked to vote on this transaction. The principal problem with such an order is that it appears that the public stockholders of RST International will not have the same tax benefits which they had as stockholders of RST. The court will, of course, entertain any proposal by which these benefits can be preserved but if that is not possible the court has concluded that it should leave to the stockholders the decision as to whether they want to become equity holders in RST and pay tax on its dividends at ordinary income rates or whether they prefer to accept the "package" at capital gain rates.[15]

The details of such an order will undoubtedly raise many questions which will have to be passed upon by the court. In view of the deadline for a decision in this case set by the Court of Appeals for the Third Circuit, the court has concluded that it will enter this general order at the present time leaving until after any appeal from its decision the details of implementation.

15. It should be noted that the possibility of ordering the so-called twinning proposal as the remedy in this case is no longer viable since RST has been dissolved as a Zambian corporation.

Since the sending out of the letters of transmittal by Morgan to the American stockholders will only add further confusion to an already confused market, this court will herewith permanently enjoin AMAX from causing Morgan to send out such letters until the conditions necessary for the tender ordered herein are complied with. Further, since an appellate court might conclude that damages is the appropriate remedy in this highly complex and difficult situation AMAX will be enjoined from withdrawing from the court the ten million dollars security heretofore entered.[16]

## III. CONCLUSIONS OF LAW

(1) The High Court of Zambia's confirmation of RST's Reduction of Capital on August 14, 1970, does not bar plaintiffs' claims asserted in Counts I, II, III and V of the amended and supplemental complaint.

(2) The amalgamation is unfair to the non-AMAX shareholders.

(a) AMAX controls RST, owes the non-AMAX shareholders a fiduciary duty, and breached that duty;

(b) Vuillequez, Prain, MacGregor, Donahue and Harold Hochschild owed a fiduciary duty to RST and they breached that duty;

(c) the burden of proving the fairness of the amalgamation is on defendants and they have failed to sustain that burden;

(d) even if the burden of proof were on the plaintiff, he has met his burden of proving unfairness.

(3) The Explanatory Statement and its Appendices violate the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder.

(4) Plaintiffs have not proved any violation of the Antitrust laws.

16. By agreement of counsel the issue of defendants' liability for counsel fees has been severed from the case-in-chief, to be determined on notice and hearing after the disposition of any appeal from this decision.

## IV. ORDER

And now, this 25th day of November, 1970, in accordance with the foregoing Findings of Fact, Opinion and Conclusions of Law, it is ordered:

(1) that defendant AMAX offer to the non-AMAX shareholders of defendant RST, Ltd., a pro rata share in defendant RST, International in accordance with each shareholder's holdings in defendant RST, Ltd., as of March 5, 1970;

(2) that defendant AMAX take all necessary steps to implement the above offer, including but not limited to, further hearings before this Court or any other United States or foreign Court, hearings before United States or foreign governmental agencies, and the drafting of a document to disclose fairly and adequately all the relevant considerations to shareholders in connection with this offer;

(3) that defendant AMAX use its best efforts to cause a public market to be made in the stock of defendant RST, International;

(4) that defendant AMAX be enjoined from causing Morgan Guaranty Trust Co. to mail to shareholders the letters of transmittal referred to in the August 31st Order of the Court of Appeals;

(5) that defendant AMAX be enjoined from withdrawing from the Court the $10 million dollars in security it has heretofore entered; and

(6) that, except where otherwise ruled upon in our Opinion, *supra*, the parties' cross motions to strike be, and the same are hereby, denied.

## MEMORANDUM AND ORDER AMENDING JUDGMENT

Plaintiffs have moved to amend the judgment entered in this case on November 25, 1970. The Court has concluded that the judgment should be amended to require AMAX to ensure that the non-AMAX RST shareholders receive the dividends and interest which have accrued to date and which may accrue in the future. We have also amended the Order to make it clear that all expenses arising out of the amalgamation should be assessed as damages against AMAX. Since the precise amount of these damages cannot be determined until after the conclusion of the litigation, an accounting of these damages must necessarily await the final disposition of all appeals from this Court's order. These damages will be assessed at the same time as the determination of the issue of counsel fees, which issue was severed for disposition after all appeals by agreement of counsel.

Further, the remedy outlined in our Order of November 25, 1970 will be amended in accordance with the following discussion. As was indicated in our earlier Opinion, the most difficult aspect of this case has been the question of remedy. The remedy ordered on November 25, 1970, the tender to the non-AMAX shareholders of their pro rata share in RST International, does not put the RST shareholders in the same position as they would have been had the amalgamation been restrained since it appears that the non-AMAX shareholders will not be able to use the tax credit which was previously available to them when RST was a Zambian corporation. Since the remedy ordered by the Court may not do justice to the plaintiffs and may in fact prove ineffectual to vindicate their rights, the Court is compelled to hold supplementary proceedings to determine whether any further or different relief is appropriate. Supplementary proceedings are necessary because the present record is not sufficient to allow the Court to frame additional relief, if necessary. The following remedies, about which the record needs further amplification, present themselves as possible alternatives or additions to the extant remedy:

(1) The Twinning Plan;

(2) Awarding damages based on the loss of the tax credits to the non-AMAX shareholders; and

(3) Damages based on the difference between what the shareholders received from AMAX for their interests in RST and what those interests were actually worth.

We shall discuss each of the above alternatives seriatim.

### (1) *Twinning*

At the time of the filing of our Opinion, the Court was under the impression that RST Zambia had been dissolved. We have since been advised that it still exists at least as a corporate shell in Zambia. There exists, then, the possibility of reviving the "twinning" proposal which might make it possible to save the tax credits formerly available to the public shareholders of RST. The defendants have argued that the implementation of the "twinning" proposal, although perhaps preserving the tax credits, would create numerous problems. For example, it might make it impossible to comply with the requirement of the nationalization agreement with the Zambian Government that the corporation holding the management and sales contract must own at least 20% of the RCM stock. These questions must be resolved before we could consider entering an order requiring RST International to reconvey the assets to RST Zambia or an order requiring the consummation of the "twinning" proposal. But since the defendants' evidence indicated that the tax credit to American stockholders of RST might be worth half the value of the stock (N.T. 1221), the Court is reluctant to abandon this concept until such time as it becomes clear that this proposal is not feasible. To determine whether the "twinning" proposal is feasible and will result in the restoration of the tax credit to the non-AMAX shareholders of RST, preliminary steps must be taken, among them the following:

(1) An opinion must be secured from the appropriate taxing authorities in the United States, Great Britain and other countries in which non-AMAX shareholders of RST have a similar problem as to whether a transfer of assets under court order from RST International to either RST Zambia or a new Zambian corporation will have the effect of restoring the tax credits to the non-AMAX shareholders;

(2) Assurances must be obtained from the Zambian Government that the transfer of these assets to RST Zambia or a new Zambian corporation will not subject them to Zambian exchange controls and that the "twinning" proposal will not result in any breach of the Nationalization agreement with the Zambian Government;

(3) Assurances from the New York and London Stock Exchanges and other exchanges where the stock is traded that the "twinned" security can be freely traded on such exchanges.

The Court will require AMAX to pursue these preliminary steps, assisted by counsel for the plaintiffs and to advise the Court whether this preliminary investigation reveals that "twinning" is feasible.

### (2) *Tax Credit*

A further alternative would be a money judgment to compensate the non-AMAX shareholders for the value of the loss of the tax credits to the non-AMAX shareholders. The only evidence available on this issue indicates that the tax credit may be worth one-half the value of RST stock. (N.T. 1221). In all fairness to the parties, however, the Court will need further evidence in order to make an evaluation of damages for loss of the tax credit.

### (3) *General Damages*

The appropriate measure of such damages would appear to be the difference in value between the package of securities received as a result of the amalgamation and the actual value of the stockholders' interest in the assets of RST. As indicated in our November 25, 1970, Opinion, the Court had no doubt that the non-AMAX shareholders' interest in RST substantially exceeded

the value paid by AMAX, but we found that on the basis of that record we could not in fairness to the parties place a precise figure on the value of these assets. This does not mean that the plaintiffs failed to carry the burden of proving damages but merely that, in view of the expedited manner in which the case was tried pursuant to the Order of the Court of Appeals, time did not permit the type of discovery which would be necessary in order to present satisfactory evidence as to the precise dollar amount of damages suffered by the plaintiffs. Indeed, on reflecting on the issue of damages in this case, the Court seriously considered the appointment of a Master to assist the Court in determining the amount of damages,[1] and, further, considered calling independent expert witnesses to assist in the evaluation of certain of the assets, particularly Baluba and Fiji. However, there simply was not time, in view of the Order of the Court of Appeals, to implement the above procedures. Nor was there time, nor has there yet been time, to determine whether the remedy fashioned by the Court in our Order of November 25, 1970 is feasible and equitable.

In summary, as to remedy, we will proceed as follows. First, the Court will order AMAX to take all necessary steps to investigate whether the "twinning" proposal is feasible. Second, the Court will order a supplementary hearing to be held on the question of remedy, where further evidence may be adduced in order to aid the Court in fashioning an appropriate final equity decree. The Court has taken the above steps, confident that the Court of Appeals will not permit an expedited trial order to deprive this Court of its duty to work justice between these parties.

### ORDER

And now, this 15th day of January, 1971, plaintiffs' motion to amend and supplement the judgment of November 25, 1970, is and the same is hereby granted as follows:

(1) that defendant American Metal Climax, Inc., (AMAX) shall cause Morgan Guaranty Trust Company of New York (Morgan) to pay forthwith to the non-AMAX holders of Roan Selection Trust Limited (RST) American depository receipts (ADRs) of record as of September 25, 1970, the following monies being held by Morgan:

(a) the dividends of RCM heretofore voted, payable October 1, 1970 and January 5, 1971 in the respective amounts of $.1376 and $.0614 per ADR share;

(b) the interest payable October 1, 1970 on the Zimco bonds, in the amount of $.09 per ADR share; and

(c) the interest on such monies pursuant to the Order of August 31, 1970 of the Court of Appeals for the Third Circuit.

(2) that defendant AMAX shall cause the interest on AMAX debentures payable January 1, 1971 to holders of record of such debentures as of December 13, 1970 to be promptly paid by Morgan to holders of record as of such date of (a) ADRs in the amount of $.24 per ADR and (b) AMAX debentures under that indenture;

(3) that defendant AMAX shall take all necessary steps to ensure the prompt payment of any future RCM dividend to the then holders of record of (a) ADRs at the rate of one-fifth of the amount payable to each RCM share; and (b) RCM shares at the declared rate per share, until further Order of the Court;

(4) that defendant AMAX shall take all necessary steps to ensure the prompt payment of the interest and principal to be paid subsequent to January 1, 1971 on the AMAX debentures and Zimco bonds to the then holders of record of (a) ADRs at the rate of $.24 and $.12 per year, respectively, per ADR, and (b) AMAX debentures and Zimco bonds un-

---

1. See Rule 53, Federal Rules of Civil Procedure.

der the respective indentures, until further Order of this Court;

(5) that all expenses, including expenses of this litigation and expenses paid by RST, or out of its property, arising out of, or incident to, the amalgamation with AMAX, shall be assessed as damages against AMAX, and shall be paid by AMAX in such amounts as may hereafter be determined subsequent to the final disposition of all appeals from this Court's final Order, such damages to be assessed at the same time as the determination of counsel fees, as to which decision is likewise reserved until after final disposition of all such appeals;

(6) defendant shall take all necessary steps to investigate whether the "twinning" plan is feasible in accordance with this Opinion and shall report to the Court at reasonable intervals with regard to its investigation. Further, the defendants shall immediately take all steps necessary, including proceedings before the High Court of Zambia, to retain RST's status as a Zambian corporation;

(7) that a supplementary proceeding be held at a date to be fixed by the Court on the issue of the remedy to be applied in this case;

(8) defendant shall advise the Court forthwith as to what steps, if any, it has taken to comply with or implement our Order of November 25, 1970.

## ORDER

And now, this 16th day of January, 1971, it is hereby ordered that our Order of January 15, 1971, is amended to read as follows:

(1) That defendant American Metal Climax, Inc., (AMAX) shall cause Morgan Guaranty Trust Company of New York (Morgan) to pay forthwith to the non-AMAX holders of Roan Selection Trust Limited (RST) American depositary receipts (ADRs) of record as of January 16, 1971, the following monies being held by Morgan:

(a) the dividends of RCM heretofore voted, payable October 1, 1970 and January 5, 1971 in the respective amounts of $.1376 and $.0614 per ADR share;

(b) the interest and principal payable October 1, 1970 on the Zimco bonds, in the amount of $.1616 per ADR share; and

(c) the interest on such monies pursuant to the Order of August 31, 1970 of the Court of Appeals for the Third Circuit;

(2) That defendant AMAX shall cause the interest on AMAX debentures payable January 1, 1971 to the holders of record of such debentures as of December 15, 1970 to be promptly paid by Morgan to holders of record of ADRs as of January 16, 1971 in the amount of $.24 per ADR;

(3) That defendant AMAX shall take all necessary steps to ensure the prompt payment by Morgan of any future RCM dividend to the then holders of record of ADRs as of the payment date of such dividend at the rate of one-fifth of the amount payable to each RCM share;

(4) That defendant AMAX shall take all necessary steps to ensure the prompt payment by Morgan of the interest and principal to be paid subsequent to January 1, 1971 on the AMAX debentures and Zimco bonds to the then holders of record of ADRs as of the payment date of such interest and principal;

(5) That all expenses, including expenses of this litigation and expenses paid by RST, or out of its property, arising out of, or incident to, the amalgamation with AMAX, shall be assessed as damages against AMAX, and shall be paid by AMAX in such amounts as may hereafter be determined subsequent to the final disposition of all appeals from this Court's final Order, such damages to be assessed at the same time as the determination of counsel fees, as to which decision is likewise reserved until after final disposition of all such appeals;

(6) Defendant, in conjunction with counsel for the plaintiffs, shall take all necessary steps to investigate whether

the "twinning" plan is feasible in accordance with this Opinion and shall report to the Court at reasonable intervals with regard to its investigations. Further, the defendants shall immediately take all steps necessary, including proceedings before the High Court of Zambia, to retain RST's status as a Zambian corporation;

(7) That a supplementary proceeding be held at a date to be fixed by the Court on the issue of the remedy to be applied in this case;

(8) Defendant shall advise the Court forthwith as to what steps, if any, it has taken to comply with or implement our Order of November 25, 1970.